Ernest B. and Mary C. White v. Commissioner.
White v. Commissioner
Docket No. 89364.
United States Tax Court
T.C. Memo 1963-17; 1963 Tax Ct. Memo LEXIS 327; 22 T.C.M. (CCH) 70; T.C.M. (RIA) 63017; January 21, 1963
Ernest B. White, C.P.A., pro se. 30 Farmstead Lane, West Simsbury, Conn. Sanford M. Kirshenbaum, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion Respondent determined deficiencies in income tax of petitioners for the years 1957 and 1958 in the amounts of $413.26 and $440.74, respectively. The sole issue is whether payments made by petitioner Ernest B. White of $2,006.13 in 1957 and $2,171.25 in 1958 pursuant to a contract for the purchase of a public accounting practice represented deductible business expenses or capital expenditures. Findings of Fact Some of the facts have been stipulated, and, as stipulated, are incorporated herein by reference. Petitioners Ernest B. White and Mary C. White, husband and *328 wife, are residents of West Simsbury, Connecticut. They filed their joint Federal income tax returns for the taxable years ending December 31, 1957 and December 31, 1958, with the district director of internal revenue, Hartford, Connecticut. Prior to 1956 petitioner Ernest B. White (hereinafter referred to as the petitioner or White) practiced as a certified public accountant in New York City for a number of years. During 1956 petitioner sought to obtain an accounting practice somewhere other than New York. Eventually, he contacted Herbert E. Hungerford, a certified public accountant practicing in West Hartford, Connecticut. Hungerford was 58 or 59 years old at the time and desired to retire from his West Hartford practice. In August 1956 petitioner reached an agreement with Hungerford for the purchase of Hungerford's West Hartford practice. A written agreement for the purchase of that practice (hereinafter referred to as the Agreement) was entered into between petitioner and Hungerford on August 16, 1956. The Agreement read as follows: AGREEMENT BETWEEN HERBERT E. HUNGERFORD AND ERNEST B. WHITE This agreement entered into on the 16th day of August 1956, between Herbert E. *329 Hungerford, party of the first part hereinafter referred to as H. H., and Ernest B. White, party of the second part hereinafter referred to as E. W. Whereas H. H. is presently engaged in the practice of public accounting as a certified public accountant and is desirous of relinquishing a portion of his accounting practice and whereas E. W. is desirous of purchasing that portion, it is hereby mutually agreed between the parties that for the sum of two thousand ($2000) dollars to be paid September 4, 1956, by E. W. to H.H., there will be turned over to E. W. by H. H. all the accounting practice of H. H. as listed in Schedule A attached to this agreement. The name Hunge ford & Company will be changed to Hungerford & White on or about January 1, 1957. Such name is to continue until an amount of sixteen thousand ($16,000) dollars is paid as hereinafter mentioned or such time as changed by mutual agreement. For the period commencing with the date of sale, H. H. will render such assistance, advice and consultation to E. W. as may reasonably be required to accomplish the transfer of the accounts to E. W. For these services H. H. will receive twenty-five (25) percent commission on all *330 billings from accounts mentioned in Schedule A until an amount of sixteen thousand ($16,000) dollars has been paid. Such payments will be made at the rate of sixty (60) dollars per week commencing Oct. 15, 1956, with adjustment on a quarterly basis to the commission percent. Upon default in payments for a period of 30 days, the accounts will revert to H. H. unless by agreement between parties payments shall be waived for a longer period. H. H. will agree not to open an office for a period of five years for the practice of accounting in the counties of Hartford or Middlesex, or the city of Springfield, Mass. for which H. H. will be entitled to receive the sum of two thousand ($2000) dollars in cash or note for thirty days on September 4, 1956. On any new business obtained by H. H. and turned over by him to E. W., H. H. will be entitled to receive 20% of the gross receipts therefrom for a period of three years from the date of turning over the account. As of the effective date of sale, E. W. will assume the lease at No. 18 Raymond Road, West Hartford, and will agree that all expenses incurred in the operation of the business from and after that date will be borne by E. W. Each *331 party would agree to pay the other at the rate of $30 per day, based on a seven-hour day, for accounting services performed by one for the other at the request of the other. All files pertaining to those accounts being sold would be retained in the possession of E. W., subject to H. H.'s access thereto at reasonable times for the purpose of obtaining information therefrom required by him in connection with services rendered prior to date of sale. Those accounts retained by H. H. and not sold to E. W. under this agreement would be subject to an option to E. W. to purchase the same at such time as H. H. might desire to sell, which option would be for a period of thirty days from the date of notice to E. W. of H. H.'s desire to sell. Price would be determined on mutual agreement. E. W. agrees to purchase office furniture, fixtures, and equipment for the sum of $1,700 payable $850 on September 4, 1956, the balance of $850 to be paid within one year from that date. No receivable or payables of H. H. are to be considered in this agreement. In witness thereof, we have affixed our signatures on this the… day of… 1956. Schedule A referred to in the Agreement was a list of 53 *332 clients of Hungerford in the West Hartford area. The $2,000 payments referred to in the second and fifth paragraphs of the Agreement were each paid by White to Hungerford in 1956. In 1956 no amounts were paid by White to Hungerford under the third and fourth paragraphs of the Agreement. White paid Hungerford $1,700 for furniture, fixtures and equipment pursuant to the eleventh paragraph of the Agreement. On the petitioners' income tax returns for 1957 and 1958 petitioners claimed certain deductions as expenses of White's accounting practice in the amounts of $2,006.13 and $2,171.25, respectively. These amounts were deducted on the returns as "commissions" and were amounts paid to Hungerford during those years by White under the third and fourth paragraphs of the Agreement. The amounts referred to in the preceding paragraph are the only ones in dispute. Subsequent to the execution of the Agreement, White moved to West Hartford, Connecticut, on or about September 5 or 6, 1956, and he thereafter occupied Hungerford's former office space. In late September or early October 1956 Hungerford gave a party or picnic in order to introduce his clients to White. Some, but not all, *333 of the clients were present. When White moved into Hungerford's former office in September, 1956, he worked only on new matters pertaining to Hungerford's former clients and did not continue any work already in progress which had been started by Hungerford. He has never done any work for 12 of Hungerford's clients covered by the Agreement, and within two years he lost about 10 more of such clients with the result that he "ended up" with about 30 of the accounts. Hungerford remained in the accounting office after White came to West Hartford for two or three weeks, completing work on his own behalf on a municipal audit for the Town of East Windsor, one of the accounts listed in the schedule attached to the Agreement. After that Hungerford was in the office "on and off" for "about two months". During that period he devoted some time to services which were required to accomplish the transfer of his West Hartford accounts to White. Thereafter Hungerford moved to Salisbury, in the western part of Connecticut; he died in 1961. Hungerford and White did not have any written partnership agreement, and no partnership returns were ever filed by them. The amounts paid by White to Hungerford *334 in 1957 and 1958 were part of the sales price for Hungerford's accounting practice, and represented capital expenditures. Opinion RAUM, Judge: Petitioners contend that the respondent erred in his determination that the payments of $2,006.13 and $2,171.25 made by White to Hungerford in 1957 and 1958 were part of the purchase price of Hungerford's accounting practice and therefore capital expenditures. They argue that a professional man such as Hungerford did not have any goodwill or other intangible asset which he could transfer in connection with the sale of his business inasmuch as its success depended solely upon his qualifications and ability; that respondent's determination conflicts with his Revenue Rulings 57-480, 1957-2 C.B. 47, and 60-301, 1960-2 C.B. 15; that a partnership or joint venture with a split fee arrangement was created by the Agreement of August 16, 1956; and that the contested amounts paid by White to Hungerford during the taxable years were ordinary expense to White and ordinary income to Hungerford under Section 162(a) or the partnership provisions of the 1954 Code. We do not agree with petitioners. They have not established that any partnership *335 or joint venture was created by the Agreement or that Hungerford and White ever intended to, or did engage in the accounting business as satoers of joint venturers. Neither have they established that the payments here involved were made pursuant to an arrangement sometimes entered into by professional men to share fees received from clients referred to one by another. Cf. Mark D. Eagleton, 35 B.T.A. 551, affirmed 97 F. 2d 62 (C.A.8). The Agreement clearly indicates that the intention of Hungerford was to terminate and dispose of his West Hartford accounting practice and of White to purchase it. It provided that on the date of sale White assume the lease of the West Hartford office which had been used by Hungerford; that White pay $2,000 on September 4, 1956, for the accounting practice of Hungerford as reflected in a list of specific clients in Schedule A attached to the Agreement, $1,700 for office furniture, fixtures and equipment, and $2,000 for a covenant not to compete for a period of five years; and that White should have the right to use the firm name of Hungerford & White after January 1, 1957, until the amount of $16,000 was paid in accordance with *336 the provisions of the fourth paragraph of the Agreement. That paragraph reads as follows: For the period commencing with the date of sale, H. H. will render such assistance, advice and consultation to E. W. as may reasonably be required to accomplish the transfer of the accounts to E. W. For these services H. W. will receive twenty-five (25) percent commission on all billings from accounts mentioned in Schedule A until an amount of sixteen thousand ($16,000) dollars has been paid. Such payments will be made at the rate of sixty (60) dollars per week commencing Oct. 15, 1956, with adjustment on a quarterly basis to the commission percent. Upon default in payments for a period of 30 days, the accounts will revert to H. H. unless by agreement between parties payments shall be waived for a longer period. This Court has decided a number of cases in which it was held that transferable goodwill existed which could be recognized in connection with the sale of professional practices. At least three of them involved sales of accounting practices. Rodney B. Horton, 13 T.C. 143; Richard S. Wyler, 14 T.C. 1251; and Malcolm J. Watson, 35 T.C. 203. In Watson *337 we discussed Revenue Ruling, 57-480 and 60-30, cited by petitioners, prior opinions of this and other courts involving sales of professional practices, and various definitions of goodwill set forth in those opinions. At page 213, we said: A definition of "goodwill" was set forth in Horton. We said there that it "is nothing more than the probability that the old customers will resort to the old place" and it is "all that good disposition which customers entertain towards the house of business, identified by the particular name or firm, and which may induce them to continue giving their custom to it." Particularly pertinent as a description of goodwill are the words of Judge Cardozo in In Re Brown, 242 N. Y. 1, 150 N.E. 581 (1926): The books abound in definitions of good will. * * * There is no occasion to repeat them. Men will pay for any privilege that gives a reasonable expectancy of preference in the race of competition. Such expectancy may come from succession in place or name or otherwise to a business that has won the favor of its customers. It is then known as good will. Many are the degrees of value. At one extreme there are expectancies so strong *338 that the advantage derived from economic opportunity may be said to be a certainty; at the other are expectancies so weak that for any rational mind they may be said to be illusory. We must know the facts in any case. It has also been said that goodwill, viewed from a transferee's standpoint, is an opportunity to succeed to the advantageous position of his predecessor. Generally, attitudes of customers or others may be transferred from one proprietor to another (1) by furnishing the transferee with all the symbols and other transferable attractions which invoke a favorable response in the customers and (2) by removing the transferor as an alternative attraction. * * * Although "goodwill" is not mentioned in the Agreement, we are convinced that all the payments provided for therein, with the exception of those for office furniture and equipment and for the covenant not to compete, were for goodwill. White's objective in entering into the Agreement was to acquire the benefit of the established practice of Hungerford in West Hartford, or, in other words, its goodwill. The second paragraph of the Agreement provided that he was to pay $2,000 for Hungerford's accounting practice and the *339 fourth paragraph provided that he was to pay the total amount of $16,000 for "services" required to accomplish the transfer of the accounts. We are not convinced that $16,000 was in fact consideration for services and only $2,000 the consideration for the accounting practice. The so-called services of Hungerford were intermittent in character and were confined to a period of only two months in the latter part of 1956. He then left West Hartford, and there is no showing that he ever returned. The "services" during that two-month period appear to have been merely of the type that a vendor of a going business would normally be expected to perform in order to make effective the transfer of that business and its goodwill to the purchaser. In this case it was to assure White of the beneficial enjoyment of the goodwill of the accounting practice he was purchasing. Such services might customarily include delivering to the purchaser a list of customers, introducing him to them, continuing in the office for a short period until the purchaser becomes acquainted with them, and other activities which may influence them to continue to give that office their business after the vendor departs. They *340 are merely ancillary to the sale of an accounting practice or other business, but ordinarily do not constitute the consideration for which the purchase price is paid. Of course, the parties could conceivably have bargained for such services, to be separately compensated, but we think that such was not in fact the case here notwithstanding that the Agreement appears to have been cast in that form. If we were to accept the form as accurately reflecting what the parties did, we would find that White paid $2,000 for Hungerford's accounting practice but bound himself to pay an additional amount up to $16,000 for some fragmentary services during a two-month period that were rendered in order to make effective the transfer of that practice. This we do not find credible. Rather, as we view the situation, White paid $2,000 for the practice at once, and obligated himself to make additional payments aggregating $16,000 therefor over a period of years depending upon how profitable that practice might turn out to be. That such was the intent of the parties is confirmed by the further provision in the fourth paragraph of the Agreement that upon default in making these payments "the accounts will *341 revert" to Hungerford. We hold that the payments of $2,006.13 in 1957 and $2,171.25 in 1958, here in controversy, which were paid pursuant to the provisions of the fourth paragraph represented part of the consideration for the purchase of Hungerford's accounting practice and were not compensation for Hungerford's services. The respondent correctly determined that they were capital expenditures and not deductible business expenses. Decision will be entered for the respondent.