MALCOLM J. WATSON AND FRANCES B. WATSON, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 78027.   Filed October 31, 1960.

*Leon L. Rice, Jr., Esq.*, for the petitioners.
*Richard C. Forman, Esq.*, for the respondent.

TRAIN, *Judge:* Respondent determined a deficiency of $412.36 in the petitioners' income tax for the calendar year 1956. The question presented is whether gain realized upon the receipt of a payment made under a contract providing for the sale of a public accounting practice is capital gain or ordinary income.

FINDINGS OF FACT.

Some of the facts are stipulated and are hereby found as stipulated.

Petitioners are individuals, husband and wife, residing in Asheboro, North Carolina. They filed a joint return prepared on the cash

basis in accordance with their method of accounting for the calendar year 1956 with the district director of internal revenue for the district of North Carolina. Frances B. Watson is a party to this proceeding solely by virtue of having joined in this return with her husband; consequently, Malcolm J. Watson will hereafter be referred to as the petitioner.

The petitioner, a certified public accountant, began the practice of public accounting in 1938 and from that time to January 1956 he engaged in said practice as a sole proprietor in Asheboro, North Carolina, under his own name. During at least part of that time he had several employees, one of whom was a certified public accountant and two of whom were not. About 50 per cent of petitioner's clients were in Asheboro, 40 per cent in High Point, North Carolina, and the remainder in other towns within a 50-mile radius of Asheboro.

The petitioner is a member of the American Institute of Accountants, the North Carolina Association of Certified Public Accountants, and the Piedmont Society of Certified Public Accountants, a branch of the North Carolina Association.

On January 2, 1956, petitioner entered into a contract of partnership with William G. Penry and Sam R. Morgan, both younger men. Neither Penry nor Morgan had previously been employed by or associated with petitioner in his practice. Each of them, prior to January 2, 1956, had gained his entire public accounting experience as an employee of Peat, Marwick, Mitchell and Company, a firm of certified public accountants with offices in many cities throughout the United States.

Penry's hometown was Denton, North Carolina, which is approximately 22 miles from Asheboro. Morgan moved to Asheboro in 1947 and engaged in private accounting practice there until 1952 when he became associated with Peat, Marwick, Mitchell and Company. At the time negotiations got under way leading to the instant partnership arrangement, Penry had never met petitioner and Morgan knew petitioner only slightly. Neither Penry nor Morgan was employed in Asheboro immediately prior to joining with petitioner in the partnership.

Petitioner's motivation in selling his practice and in forming a partnership was two-fold: First, to service adequately his expanding practice, the choice facing petitioner being to take in partners or to restrict his practice; and second, to make provision during his lifetime for the sale of his practice.

The partnership contract provided that the three parties agreed to form a partnership, the firm name of which was to be Watson,

Penry, and Morgan, Certified Public Accountants, for the purpose of engaging in the practice of public accounting. Paragraph IV of the contract provided in part:

Recognizing that party of the first part [petitioner] has, over a period of years, established a substantial clientel [sic] in the practice of public accounting in his own name and by his own efforts, and that he now has such practice and the good will thereof, parties of the second part [Penry and Morgan] agree to purchase and pay for as hereinafter provided, and party of the first part agrees to sell to the said parties of the second part a forty-five per cent (45%) interest in the practice of said party of the first part, which said interest for the purpose of such sale and purchase, and for the determining of the purchase price thereof, shall be valued at a figure which shall be equal to forty-five per cent (45%) of the total value of the following components:

(a) Gross receipts of the party of the first part from the practice of public accountancy for the calendar year 1955, which said gross receipts total $41,831.46.

(b) Book value of office furniture and equipment as of December 31, 1955, which said book value is $1,297.69.

(c) Collectible clients' accounts and work in process at December 31, 1955, which are presently valued at $11,279.32.[1]

   *       *       *       *       *       *       *

It is understood that parties of the second part are acquiring no interest whatsoever in component (a), defined above, and that the value of same is referred to solely for the purpose of determining the purchase price to be paid by parties of the second part to party of the first part for the interest which they are acquiring in components (b) and (c), and in future earnings of the partnership.

Supplementing paragraph IV was the following provision:

In anticipation of the gradual retirement of the party of the first part from active participation in the practice, and as a part of the consideration moving party of the first part to agree to sell and transfer his remaining 55% interest in said practice to the parties of the second part, it is further agreed between the parties hereto as follows:

(1) Party of the first part agrees to sell, and parties of the second part do hereby jointly and severally obligate themselves to purchase and pay for in the manner hereinafter set out, the said remaining 55% interest of the party of the first part in the partnership practice on January 1, 1966. The value of said 55% interest, and the purchase price therefor to be paid by the parties of the second part to the party of the first part, shall be in an amount equal to 55% of the total value of the following components:

(a) The gross receipts of the partnership for the calendar year 1965.

(b) The book value of office furniture and equipment on December 31, 1965.

(c) Collectible clients' accounts and work in process on December 31, 1965.

---

[1] This amount was adjusted to $9,593.28 pursuant to the contract which provided for an adjustment in the amount of any difference between the estimated value of the collectible clients' accounts and work in progress at Dec. 31, 1955, and the actual value thereof. When this amount, representing the actual value of the accounts receivable and work in process at Dec. 31, 1955, was received by the partnership, it was reported by petitioner on his income tax return. Accordingly, petitioner acquired a basis of $4,316.98 for the 45 per cent in the receivables transferred to Penry and Morgan.

(2) It is understood that the sale and purchase at said remaining 55% interest of the party of the first part shall in no way affect his right to receive his share of undivided profits of the partnership on hand as of December 31, 1965 and collections made on component (c) defined above in this paragraph. Party of the first part shall also continue to receive his share of future profits of the partnership until December 31, 1970 and in the proportion as hereinafter set out.

Taken together, these provisions of the contract obligated petitioner to sell and Penry and Morgan to purchase the accounting practice established by petitioner. Part of the purchase price was to be paid in installments over several years from the signing of the contract, with the remainder of the purchase price, determinable under the contract, to be paid on or after January 1, 1966. The term of the contract providing for the ultimate transfer of the entire practice to Penry and Morgan was one of the major inducements for their entering into the contract.

The amount of the first payment on the purchase price for the practice was $23,725.09 [2] of which $7,500, as a first installment, was paid to petitioner in the calendar year 1956.[3] Applied first against 45 per cent of $9,593.28 and $1,297.69, petitioner's bases, respectively, for the accounts receivable and work in progress at December 31, 1955, and the office furniture and equipment at that date, there remained an excess of $2,599.06, reported by petitioner as long-term capital gain.

The method of computing the purchase price for the practice by including petitioner's 1955 gross receipts, and the partnership's 1965 gross receipts, was consonant with a method of determining the purchase price for an accounting practice used by other accountants and with one of several methods of determining said price suggested by the American Institute of Accountants.

Provision for the sharing of partnership profits and losses was contained in paragraph IX which reads as follows:

The net profits of the partnership shall be divided and the net losses of the partnership shall be borne in the following proportions, except that all losses resulting from the wrongful act or gross negligence of any partner shall be charged to him in full:

| | |
|---|---|
| M. J. Watson | 50% |
| W. G. Penry | 25% |
| Sam R. Morgan | 25% |

This division of profits shall remain in effect for the first five years during which time each partner shall devote his entire working time and energy to the

[2] 45 per cent of the sum of the gross receipts from the practice for the calendar year 1955 ($41,831.46), the book value of office furniture and equipment as of Dec. 31, 1955 ($1,297.69), and collectible clients' accounts and work in process at Dec. 31, 1955 ($9,593.28).

[3] Penry and Morgan did not, on their respective individual tax returns for 1956, deduct the $3,750 each had paid to petitioner.

business of the partnership. Thereafter, M. J. Watson will be partially retired but shall devote at least one-half of his time to the business of the partnership, the profits then to be shared equally among the three partners. * * *

[Penry and Morgan may elect, under the contract, to pay petitioner two-thirds of the value of his 55 per cent interest in five equal annual installments commencing on January 1, 1966, and concluding on January 1, 1970. Petitioner's interest in the profits for the period January 1, 1966, to December 31, 1970, will then decrease from 33⅓ per cent to 25 per cent.]

The contract further provided that on December 31, 1970, petitioner would retire from active participation in the business and would have no further share in the future profits of the partnership.

Provision was made for the surviving partners to acquire the interest of any deceased partner by payment to the latter's estate of a sum to be determined by the use of formula set forth in the contract. In the event of the death of a partner or of voluntary dissolution, the contract provided that the remaining partners should share in ownership of the partnership in the same proportion as their individual ownership between each other existed prior to such event. Each partner agreed that the firm might continue to use his name in its business after his death or retirement, without compensation, if the surviving partners so elected.

An exception to the general provision for dissolution of the partnership was contained in paragraph XXI. This exception permitted petitioner, upon 60 days' written notice to the parties of the second part, to terminate the partnership at December 31, 1957, if he so desired. In the event petitioner terminated the partnership at that date, he was required to refund to Penry and Morgan all payments received on the purchase price, without interest, plus their share of undistributed cash earnings to that date. This same provision also permitted Penry and Morgan to terminate the partnership on December 31, 1957, in which event petitioner was required to refund only 75 per cent of payments received on the purchase price, subject to certain restrictions. The contract provided that if Penry and Morgan elected such voluntary termination they should release all of their interest in the assets of the partnership and not accept, without the written consent of petitioner, any business from any clients who were petitioner's clients at the beginning of the partnership.

Notice of the formation of the partnership was sent by letter to each of the clients of petitioner which letter explained the formation and the reason for it. Further notice of the formation of the partnership was announced in the local newspaper. Petitioner took Penry and Morgan around to meet his clients, none of whom was lost by reason of the transfer of the practice to the partnership.

From and after January 2, 1956, the accounting practice of the partnership has been conducted under the name of Watson, Penry

and Morgan. The business of the partnership has been carried on in the same offices and at the same location which the petitioner had used to carry on his public accounting practice prior to the formation of the partnership. The partnership has continued in operation through the date of this trial without any changes in the basic partnership agreement.

Petitioner reported the gain of $2,599.06 realized in 1956 upon the receipt of the first payment made under the contract providing for the sale of his public accounting practice as long-term capital gain from the sale of goodwill. Respondent increased petitioner's taxable income on the ground that the gain realized constituted the assignment of a share in future earnings of the partnership and is taxable as ordinary income.

Petitioner had goodwill in his accounting practice which goodwill was separate and apart from his own ability and personality.

Petitioner, in the contract described above, intended to convey and did convey, and Penry and Morgan intended to purchase and did purchase, this goodwill which adhered to petitioner's accounting practice.

The consideration of $23,725.09, the initial payment under this contract, was for an interest in the tangible assets and goodwill of petitioner's accounting practice. The gain of $2,599.06 realized in 1956 upon the receipt of the first installment of the initial payment under the contract is gain from the sale of goodwill, a capital asset held by the petitioner for more than 6 months.

## OPINION.

Petitioner, a certified public accountant, entered into a contract providing for the sale of his accounting practice to two younger men with whom he then formed a partnership for the practice of accountancy. The consideration due petitioner under this contract was to be computed in two payments, the first at the time of the signing of the contract and the second 10 years later. At the time of the first payment, the younger men were to receive a 45 per cent interest in the tangible assets of the practice. The remaining 55 per cent interest in these assets was to pass to the younger men at the time of the second payment at which time petitioner would have no interest in the partnership. The goodwill of petitioner's practice was included in this contract of sale and was to pass to the younger men.

In the taxable year in issue petitioner received the first installment on the initial payment under the contract which installment exceeded his basis by the amount of $2,599.06. Petitioner reported this amount as long-term capital gain from the sale of goodwill. Respondent, however, contends that this amount is ordinary income from the assignment of a share in future earnings of the partnership.

On two occasions in recent years the respondent has published his views regarding the taxation of proceeds from the sale of alleged goodwill. In Revenue Ruling 57–480, 1957–2 C.B. 47, it was acknowledged that goodwill is a capital asset; that gain resulting from the sale of goodwill constitutes capital gain; and that this Court has held that goodwill may be sold by professional men. It was emphasized therein, however, that "Transferable goodwill does not attach to the business of a professional man or firm, or to any other business, the success of which depends solely upon the professional skill, ability, integrity and any other personal characteristics of the owner." Although it is not clear, it appears that the position taken by the respondent in this revenue ruling was that where a professional practice existed, the success of which did not depend solely upon the skill, ability, etc., of the owner, such practice could be sold and the proceeds therefrom deemed to be from a sale of goodwill if the right to the exclusive use of the firm name was assigned to and exercised by the assignee. Most relevant to the problem at hand is the following quoted portion of the ruling:

However, each case must be decided upon the basis of its own facts to determine the extent to which the consideration received is from the sale of goodwill. For example, if the seller retains a right to fees collected after the sale for services performed before the sale, or receives payment for relinquishment of all or part of his right to such fees, the amount received by him under this arrangement is attributable to services performed before the sale rather than to the sale of goodwill and would thus constitute ordinary income. Also, if the seller retains a right to any fees or revenue collected for services performed at any time after the sale, or the purchaser agrees to pay an amount equal to any part of such fees or revenue, the nature of his interest in the business or profession and the earnings therefrom is such that the amounts received by him under this arrangement constitute ordinary income from the business rather than proceeds from the sale of goodwill. *Further, where a member of a professional firm transfers to another person a part of his interest in the firm and purports to assign a right to use the firm name, no part of the consideration received by him for the transfer will be regarded as being received upon a sale of goodwill if his name is in the firm name and he continues to be a member of the firm.* [Emphasis added.]

Following the decision in *Masquelette's Estate* v. *Commissioner*, 239 F. 2d 322 (C.A. 5, 1956), respondent modified, in part, his previously stated views and conceded that the existence of transferable goodwill may be recognized in connection with the sale of a business or profession the success of which is not dependent solely upon the personal qualifications of the owner even though such a sale does not involve the assignment of the right to the exclusive use of the firm name. Rev. Rul. 60–301, 1960–2 C.B. 15. It was reiterated in this ruling, however, that it is respondent's position that personal characteristics or qualifications do not constitute goodwill as an item of property

and do not exist in such form that they can be the subject of transfer and that the question whether goodwill is involved in the sale of a business is essentially one of fact to be determined in each case in the light of all the surrounding circumstances.

The respondent's position that personal characteristics or qualifications do not constitute goodwill as an item of property as may be the subject of transfer is consonant with our views on the subject. In *Providence Mill Supply Co.*, 2 B.T.A. 791 (1925), we said: "Ability, skill, experience, acquaintanceship, or other personal characteristics or qualifications do not constitute good will as an item of property; nor do they exist in such form that they could be the subject of transfer." The case of *E. C. O'Rear*, 28 B.T.A. 698 (1933), aff'd. 80 F. 2d 473 (C.A. 6, 1935), afforded a situation which enabled us to apply this general principle to facts concerning a professional partnership. There the petitioner, a distinguished attorney and former member of the Court of Appeals of Kentucky, entered into agreements with two attorneys where first one would join him in the practice of law and later the second would join the partnership already formed. Each agreed to pay O'Rear $25,000 "As further differential in division of fees and income of the firm business, due to the conceded excess value of good will and unearned fees of said O'Rear put into the firm * * *."

The respondent included the $50,000 received by O'Rear as income in his return with the explanation that the amount represented the estimated present value in 1922 of a two-thirds interest in the petitioner's expected future profits from his profession. In support of his treatment of the amount received, O'Rear argued that the sale of the right to share in the business and profits of a law practice was the sale of a capital asset and that the asset sold was goodwill or the goodwill of his business with the right to share in future profits. Upholding the respondent, we said:

In the first place it is at least doubtful whether a professional man can sell or dispose of any good will which may attach to his practice except perhaps by contracting to refrain from practicing. * * * [Citations omitted.] The petitioner no doubt enjoyed a good reputation as an able lawyer. This he had built up through the skill with which he rendered personal services to clients. It was probably of value to him. But it attached to his person. He could not transfer it piecemeal to two others. * * * [Citations omitted.] They could not acquire part of his reputation or ability. Furthermore the proof in this case does not justify or permit a separate valuation of any good will or other intangible asset which attached to the petitioner's practice of law on March 1, 1913. The value of any such intangible asset would depend upon the existence of an excess of his earnings over and above proper compensation for the services which he actually rendered. * * * [Citation omitted.] So far as we know there was no such excess prior to March 1, 1913. But the most damaging defect in the petitioner's argument is the fact that the portions of the agreement with which we are concerned do not even purport to be sales contracts. They do not have the effect of sales contracts. If the petitioner had any "good will"

theretofore, obviously he disposed of none of it by entering into these contracts. Thus the provisions of the statutes relating to gain or loss upon the sale or disposition of property do not apply. He was not to refrain from practicing; on the contrary, he was to use every talent and every asset which he had for practicing law successfully. The agreement recognized that he would contribute more to the success of the firm than the others and therefore he should be favored in some way in the compensation which he would receive. The desired result might have been accomplished by a provision that he should have more than one third of the annual earnings. Instead he agreed, in consideration of an immediate cash payment, to relinquish his right to a part of future earnings. These payments were income to him. The contracts called them "a differential in division of fees and income of the firm business." Compensation for personal services is income regardless of whether it is paid directly by clients or whether it is received through an arrangement with partners whereby they advance certain amounts for the privilege of taking a larger share of the partnership profits than their personal contribution would otherwise justify.

The sale of a public accounting practice by the sole proprietor thereof, raising the question whether a certain payment received for the practice was for the sale of goodwill, divided this Court over the applicability of the *O'Rear* case. In *Rodney B. Horton*, 13 T.C. 143 (1949), a certified public accountant, operating as a sole proprietor, sold the business and assets of his firm, which assets included the goodwill of the firm, embracing the exclusive right in the purchasers to use the firm name within the State in which the practice was located, all furniture and fixtures, all work papers and correspondence files. The petitioner agreed to recommend to the clients of the firm, in every manner consistent with the ethics of the profession of public accountancy, that they continue to allow their accounting requirements to be handled by the purchasers as successors to said business. In addition, Horton covenanted not to engage in the practice of public accounting for a period of 6 years from the date of sale.

Resisting the reasoning of three dissenting judges that no goodwill grows out of personal efforts and ability, this Court held that a part of the purchase price received by the petitioner was for the purchase of goodwill. We found there that it was clear from the contract that goodwill was being sold by the seller and purchased by the buyer. We commented that the seller thought he was selling, among other things, the goodwill of his accounting business and the purchaser thought it was buying goodwill and agreed to pay for it.

In *Richard S. Wyler*, 14 T.C. 1251 (1950), we again rejected the respondent's use of the *O'Rear* case to deny capital gains treatment to a certified public accountant who had received payment for the sale of his accounting practice. We said there that *Wyler* was not distinguishable from *Horton* where goodwill was a part of the assets transferred in a sale by a certified public accountant of his business. Wyler, a sole proprietor certified public accountant who employed five accountants, sold his practice to a large accounting firm. In

conjunction with the sale, it was provided that Wyler should become a partner in the acquiring firm; that he should have the direction of the business of his old clients "in order that the goodwill of the business heretofore conducted by * * * [him] may be retained and may accrue to and for the benefit of * * * [the acquiring firm]"; and that he should "exert his best efforts to hold said clients as clients of * * * [the acquiring firm] and to hold their said business for the benefit of * * * [said firm]." The agreement between Wyler and the acquiring firm further provided:

10. * * * In consideration of the transfer of good will by * * * [Wyler] to * * * [the firm] provided for herein, * * * [the firm] will pay to * * * [Wyler] the sum of Fifty Thousand Dollars ($50,000.00) in cash upon the signing of this agreement. * * *

11. The fixed compensation or salary to be paid by * * * [the firm] to * * * [Wyler] during the term of this agreement shall be the sum of Ten Thousand Dollars ($10,000.00) per year, payable in equal monthly installments on the last day of each month.

12. In addition to said fixed compensation, * * * [the firm] shall pay to * * * [Wyler], for and during the term of this agreement, amounts computed as follows:

For each yearly accounting period * * * the sum of Ten Thousand Dollars ($10,000.00) or a sum equal to one per centum (1%) of the profits of * * * [the firm] for said period, whichever is greater.

The partnership agreement was for the period February 7, 1944, to June 30, 1947. Wyler agreed that for a period of 3 years after the termination of the partnership agreement he would not solicit or do any accounting or auditing work of or for any of the clients of the partnership nor, without the express consent of the partnership, negotiate for or accept a position of any kind with any of the clients of the partnership during the term of the agreement or within 1 month after its termination.

The respondent contended that the $50,000 was not payment for Wyler's goodwill, but, instead, was payment for personal services which Wyler performed for the partnership. Part of respondent's argument was that the partnership's ultimate acquiring of a right to serve Wyler's clients, the "goodwill" argued for, was expressly tied into the services to be performed under the contract. In addition to his principal argument, respondent contended that a professional man accrued no goodwill as a salable property apart from his person.

On the basis of *Horton*, this Court rejected the respondent's secondary argument. Focusing on the principal problem, whether Wyler in fact sold the goodwill or whether the $50,000 was a payment for his personal services, we found, on the basis of the testimony and the terms of the various documents introduced into evidence, that the $50,000 was paid as the purchase price for Wyler's practice or his goodwill. As in *Horton* where it was held that payment for the

elimination of an alternative attraction, by a covenant not to compete, was not inconsistent with a sale of goodwill, so also in *Wyler* we held that the payment for the same purpose, by the acquisition of Wyler's services, did not preclude a sale of goodwill. In both cases we were faced with the problem of determining the amount paid for the goodwill as distinguished from the price paid for the services or the covenant not to compete.

A definition of "goodwill" was set forth in *Horton*. We said there that it "is nothing more than the probability that the old customers will resort to the old place" and it is "all that good disposition which customers entertain towards the house of business, identified by the particular name or firm, and which may induce them to continue giving their custom to it." Particularly pertinent as a description of goodwill are the words of Judge Cardozo in *In Re Brown*, 242 N.Y. 1, 150 N.E. 581 (1926):

> The books abound in definitions of good will. * * * There is no occasion to repeat them. Men will pay for any privilege that gives a reasonable expectancy of preference in the race of competition. Such expectancy may come from succession in place or name or otherwise to a business that has won the favor of its customers. It is then known as good will. Many are the degrees of value. At one extreme there are expectancies so strong that the advantage derived from economic opportunity may be said to be a certainty; at the other are expectancies so weak that for any rational mind they may be said to be illusory. We must know the facts in any case.

It has also been said that goodwill, viewed from a transferee's standpoint, is an opportunity to succeed to the advantageous position of his predecessor. Generally, attitudes of customers or others may be transferred from one proprietor to another (1) by furnishing the transferee with all the symbols and other transferable attractions which invoke a favorable response in the customers and (2) by removing the transferor as an alternative attraction. Note, "An Inquiry Into The Nature of Goodwill," 53 Col. L. Rev. 660, 668 (1953).

The two methods usually employed to transfer attitudes of customers are not necessarily unrelated to each other. One method is by removing the transferor as an alternative attraction. In *Horton* this was accomplished by the transferor covenanting not to compete with the transferee for a period of 6 years. Finding the consideration for this covenant to be separate from the consideration paid for the goodwill of the practice, we held that consideration to be ordinary income. A second method, furnishing the transferee with all the symbols and other transferable attractions which invoke a favorable response in the customers, suggests an additional device for removing the transferor as an alternative attraction. That is for the transferor to obligate himself to work for the transferee for a given period of time. This not only eliminates the alternative attraction but also

furnishes the transferee with one more symbol or attraction which in the past invoked a favorable response in the customers of the old business.

Just this method was employed in the *Wyler* case. The instant case resembles *Wyler* in all significant aspects except one. That is that petitioner did not transfer the goodwill of his practice for a single present consideration but rather he entered into a contract to sell the goodwill of his practice for a present determined consideration and a future determinable consideration to purchasers with whom, as partners, he continued to practice. It is on the basis of this distinction that respondent would have us reach a different result. His argument is that the goodwill of a professional man may not be split into parts with a portion being conveyed and a portion retained and that where there is a purported sale of a part of such goodwill nothing is in fact conveyed so that the consideration received must be ordinary income from the assignment of future earnings.

In *Wyler* the petitioner transferred all of his vendible goodwill to the transferee firm for a consideration which we found to be separate from the consideration paid to him for services rendered as a member of the partnership. What in fact did the transferee in that case acquire? Wyler agreed to permit the transferee to use his name, to use his place of business, to take possession of his working papers. He further agreed to recommend to his clients that they permit the transferee to do their accounting work. For an additional and separate payment, Wyler agreed to eliminate himself as an alternative attraction, and to provide the transferee with an additional symbol of his old practice, namely by becoming a partner in the transferee. It was explicit in the contract that he would do everything necessary to retain the business of his old clients for the benefit of the transferee.

Petitioner, in the instant case, did much the same thing. Watson, for a payment in part determined and in part determinable, agreed to sell the goodwill of his practice to Penry and Morgan. This gave the transferees the use of his name, the use of his place of business, possession of an undivided interest in his working papers, and his assurance that he would recommend to his clients that, at present, they permit the partnership of which Penry and Morgan were members to do their accounting work. Intrinsic in this arrangement was Watson's agreement to make the further recommendation to his clients, at the end of the 10-year period (at which time Penry and Morgan would pay the balance of the consideration and Watson would transfer to them his remaining interest in the partnership) that the clients permit the partnership to do their accounting work even though he was no longer a member of that partnership.

If the respondent relies upon the *O'Rear* case as authority for his position, as he appears to do, he is in error. Our conclusion in *O'Rear* was that the petitioner there did not prove that he had any vendible goodwill since all he had was his own skill and ability which he could not transfer, as property to others, piecemeal or otherwise, and further that the contract did not purport to sell goodwill, if it had in fact existed. We have reached a different factual conclusion, however, in two other cases. *Rodney B. Horton* and *Richard S. Wyler*, both *supra*. Where there exists vendible goodwill, it is an asset, albeit an intangible one, separate and apart from the personal skills and ability of the transferor. Gain realized on the sale of this asset is capital gain, regardless of whether the transferor continues, as a partner, in active practice with the purchasers. *Richard S. Wyler*, *supra*.

Given this intangible capital asset and a contract to sell the whole of it to purchasers for a present determined consideration and a future determinable consideration, the problem before us is whether gain realized upon the receipt of the present consideration is gain from the sale of a capital asset.

What the extent of the business opportunity was that Watson made available to Penry and Morgan in the taxable year in issue does not concern us. An opportunity to gain the benefit of an established practice was transferred; some privilege that gave Penry and Morgan "a reasonable expectancy of preference in the race of competition" was conferred. We find that the consideration paid was for the goodwill of Watson's practice and the gain realized therefrom is taxable as capital gain.

*Decision will be entered for the petitioners.*