Estate of Walter A. Krafft, Deceased, Julia C. Krafft and The Continental Illinois National Bank and Trust Company of Chicago, Illinois, Executors, and Julia C. Krafft, individually v. Commissioner.
Estate of Krafft v. Commissioner
Docket No. 76355.
United States Tax Court
T.C. Memo 1961-305; 1961 Tax Ct. Memo LEXIS 48; 20 T.C.M. (CCH) 1571; T.C.M. (RIA) 61305; October 31, 1961
*48 The petitioner operated a restaurant and retail merchandise business on premises leased from a corporation which she controlled. She made certain improvements upon the leased premises. After four years of operations resulting in substantial losses, she sold the business, including the leasehold improvements and other business property, to another corporation, 85 percent of the stock of which she owned, the consideration being the assumption by such corporation of indebtedness of the petitioner arising out of the business and consisting principally of indebtedness owing to the lessor corporation. The indebtedness assumed was $100,000 in excess of the adjusted basis of the assets transferred, resulting in gain in that amount. Held: That at the time of sale of the business any goodwill thereof had no fair market value or no more than a nominal value; that therefore no part of the selling price, and hence no portion of the gain, was attributable to goodwill of the business; that such gain was derived from the sale of the leasehold improvements and other tangible assets; that such assets in the hands of the transferee were property of a character subject to the allowance for depreciation; *49 and that the gain is therefore to be considered as ordinary gain under section 1239 of the Internal Revenue Code of 1954. *50 Jackson L. Boughner, Esq., 39 So. La Salle St., Chicago, Ill., for the petitioners. David M. Robinson, Esq., for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined a deficiency in income tax in the amount of $59,395.20 for the taxable year 1955. The issue for decision is whether, as claimed by the petitioner, she realized a long-term capital gain of $100,000 upon the sale of assets of a business or whether, as determined by the respondent, she derived ordinary income in that amount. Other allegations of error have been *51 abandoned. Findings of Fact Some of the facts are stipulated and are incorporated herein by this reference. In the year 1955 Walter A. Krafft and Julia C. Krafft were husband and wife, residing in River Forest, Illinois. They filed a timely joint income tax return for the taxable year 1955 with the district director of internal revenue at Chicago, Illinois. The estate of Walter A. Krafft is a party to this proceeding only because a joint return was filed for the taxable year 1955, and Julia C. Krafft will hereinafter be referred to as the petitioner. During all times pertinent herein the petitioner owned an interest in two corporations. One was Steven's Candies, Inc., a Wisconsin corporation of Milwaukee, Wisconsin, the name of which was changed in 1956 to Lakeside Farms, Inc., which will generally hereinafter be referred to as "Candies." At all pertinent times its stock was held as follows: petitioner 48.5 percent; Walter A. Krafft 13.9 percent; petitioner's daughter 10.4 percent; petitioner's two sisters 20.4 percent; and an attorney 6.8 percent. The other corporation was Steven's Candy Kitchens, Inc., an Illinois corporation having its principal place of business in Chicago, *52 the name of which was changed in 1956 to 611 North Sacramento Corporation, which will generally hereinafter be referred to as "Kitchens." At all pertinent times its stock was held as follows: petitioner 85 percent; petitioner's two sisters 10 percent; and an attorney 5 percent. Kitchens was primarily engaged in the manufacture and sale of candy products. Candies was in the business of retail selling of candy and distributed Kitchens' products in Wisconsin. On April 2, 1951, Candies acquired, at a cost of $63,000, property near Genoa City, Wisconsin, consisting of 16 acres containing 8 buildings. On May 1, 1951, Candies leased this property to the petitioner for a 5-year period ending April 30, 1956, at an annual rental of $3,600, payable in monthly installments of $300. In the lease agreement the petitioner as lessee agreed to pay all the taxes and insurance on the property and to maintain it in good repair. It was provided that the lessee should have the right at any time during the term of the lease to build additional structures upon the premises or further improve the premises and to alter, remodel or add to any structures then or thereafter located on it. It was provided *53 that any such additional structures and improvements or alterations or additions should remain upon the premises and become the property of the lessor upon the termination of the lease. The petitioner, after leasing the property, made extensive improvements and alterations in converting the property into a restaurant and retail sales operation, which she conducted from May 1, 1951 to December 31, 1954 as a sole proprietorship under the name "Honey Bear Farm." A chicken house was converted into a tea room, gift shop, and offices. A tool shed was converted into a building called "Country Kitchen" in which candy and bakery goods were sold. A cow barn was converted into a building called the "Party Barn" containing a gift shop at which china, glasswares, and other merchandise were sold. A garage and the machine storage shed was converted into a building called "Terrace Shop" in which artificial flowers and plant accessories were sold. A pump house was converted into a building called "Candle Shop" where candles were manufactured. A garage was converted into a building called "Children's Shop" where toys and other gifts were sold. A dwelling was converted into a building called "Cherry *54 Tree House" in which apparel and accessories were sold. A turkey shed was converted into an art studio in which art lessons were given and art goods sold. A swampy area was converted into a sunken garden, and an area by the lake was made into a play ground. Other miscellaneous improvements were made to the property. On January 2, 1952, Candies leased to the petitioner three buildings on property adjoining the 16 acres, at an annual rental of $4,500, for a 5-year term ending December 31, 1956. One building was known as the "garage receiving room and employees' lunch room," one was known as the "Bakery," which adjoined the Honey Bear Country Kitchen building, and the third was known as "Dwelling No. 7," located north of Honey Bear Farm parking lot. The lessee agreed to make necessary repairs, keep the premises in good condition, and pay any assessments for water tax. During the years 1951 through 1954, the cost of conversion of the buildings as described above, together with the cost of other leasehold improvements, amounted to $182,029.64. There were no leasehold improvements made in the 9 months ended September 30, 1955. Thereafter through December 31, 1959, leasehold improvements *55 costing $26,779.12 were placed on the property, $11,679.15 being for improvements made during the year 1956. On March 15, 1955, petitioner sold to Kitchens her interest in the Honey Bear Farm business. The bill of sale provided as follows: FOR AND IN CONSIDERATION of the sum of Ten Dollars ($10.00) and other good and valuable considerations, the sufficiency of which are hereby acknowledged, the undersigned, JULIA C. KRAFFT * * * does hereby sell and transfer, as of the close of business on December 31, 1954, unto STEVEN CANDY KITCHENS, INC. * * * the business carried on at Genoa City, Wisconsin, under the name and style of Honey Bear Farm, including cash on hand in the said business, accounts and notes receivable, inventories, fixed assets and leasehold improvements, and all other property and assets used in connection with or incident to the conduct of the aforementioned business, including the trade name and good will of the said business, and the undersigned, as a further inducement to the purchase of the said business by STEVEN CANDY KITCHENS, INC., does hereby represent and warrant that no other person, firm or corporation has any right, title or claim in and to the said *56 business, and that there are no liabilities of any kind, character or description pending or claimed against the said business other than those set forth in the attached balance sheet (which is made a part hereof) as of December 31, 1954. The resolution of the board of directors of Kitchens authorizing the purchase provided as follows: RESOLVED, that this Company purchase from JULIA C. KRAFFT the business carried on by her at Genoa City, Wisconsin, under the name and style of Honey Bear Farm, together with all of the assets and property owned by or used in connection with the said business, including the good will thereto, and the trade name; and BE IT FURTHER RESOLVED, that the said purchase be consummated as of December 31, 1954, at the price stated in the balance sheet of "Honey Bear Farm" dated December 31, 1954 which is to be included and made a part of the minutes of this meeting, plus the sum of $100,000.00 which this Company considers to be a fair estimate of the value of the good will attached to the said business; and BE IT FURTHER RESOLVED, that the officers of this Company be and they hereby are authorized and directed to consummate the said purchase and make payment *57 therefor at such time and in such manner as may be satisfactory to the Secretary of this Company. The balance sheet of Honey Bear Farm as of December 31, 1954, referred to in the bill of sale and in the corporate resolution of Kitchens was as follows: ASSETS
Cash
$ 16,759.02
Accounts and note receivable
6,715.27
Inventories
81,150.09
Prepaid insurance
6,679.62
Fixed assets - at cost
$ 75,398.72
Less: Accumulated depreciation
18,723.87
56,674.85
Leasehold improvements - unamortized cost
141,339.94
Total
$309,318.79
LIABILITIES AND CAPITAL
Due Steven's Candies, Inc. of Milwaukee
$403,072.62
Less: Due from Steven Candy Kitchens, Inc.
4,960.00
$398,112.62
Accounts payable
4,878.34
Employees' income tax withheld
1,481.77
Accrued expenses
5,645.86
Julia C. Krafft, Capital (Deficit)
(100,799.80)
Total
$309,318.79
The Honey Bear Farm business was thereafter operated by Kitchens until March 31, 1960. During the year 1955, the indebtedness owing to Candies which was assumed by Kitchens was reduced from $403,072.62 to $222,957.60. The remainder of $222,957.60 was paid off in 1956 by Kitchens. *58 Until 1956, besides the Honey Bear Farm business, Kitchens continued to be engaged primarily in the manufacture and sale of candy products, and Candies continued until that time in the business of retail selling of candy, distributing Kitchens' candy products in Wisconsin. In the summer of 1956 each corporation sold to outside parties its candy business and the use of its name. It was at this time that Kitchens' name was changed to "611 North Sacramento Corporation" and Candies' name was changed to "Lakeside Farms, Inc." During the years Honey Bear Farm was operated by the petitioner, it sustained net losses. Such net losses, as adjusted, are shown in the following summary of operations. [1]
1951
1952
1953
1954
Sales
$ 47,206.63
$189,117.07
$458,827.51
$433,456.25
Cost of goods sold
31,406.25
141,357.99
380,409.64
312,933.74
Gross Profit
$ 15,800.38
$ 47,759.08
$ 78,417.87
$120,522.51
Expenses
56,515.94
105,679.95
165,487.96
189,930.75
Net (Loss) per return
[40,715.56)
[57,920.87)
[87,070.09)
[69,408.24)
Subsequent adjustments per agreement
with I.R.S. *
15,753.18
24,824.43
Net (Loss)
[40,715.56)
[42,167.69)
[62,245.66)
[69,408.24)
*59 The following is a summary of operations of the Honey Bear Farm by Kitchens during 1955 and 1956, as shown in Kitchens' Federal income tax returns: 1/1/55-
Yr. Ended
10/1/56-
9/30/55
9/30/56
12/31/56
Sales
$437,119.49
$649,519.83
$151,293.69
Cost of goods sold
214,376.66
324,160.40
60,330.21
Gross Profit
$222,742.83
$325,359.43
$ 90,963.48
Expenses
242,669.38
310,536.81
83,427.69
Net Profit or (Loss) per return
[19,926.55)
$ 14,822.62
$ 7,535.79
Subsequent adjustments per agree-
ment with I.R.S.
2,414.27
Net Profit or (Loss)
[17,295.28)
$ 14,822.62
$ 7,535.79
Kitchens sustained net losses from operation of the Honey Bear Farm in the years 1957, 1958, and 1959 in the respective amounts of $15,968, $38,209, and $25,092, the details of which are not shown. *60 The profits or losses of Kitchens, including the operations of the Honey Bear Farm business, for the years and period set forth, were as follows: 9 months ended Septem-
ber 30, 1955
$ 3,038.65
12 months ended Sep-
tember 30, 1956
2,765.21
3 months ended Decem-
ber 31, 1956
280.74
Calendar year 1957
(48,965.33) loss
Calendar year 1958
(15,347.04) loss
Calendar year 1959
(12,530.59) loss
As of December 31, 1954, Kitchens had a post-1913 earned surplus of $290,706.35. In January 1960, the petitioner listed the Honey Bear Farm property and certain other farm properties which had originally cost Candies $161,981 for sale or lease with a real estate broker in Chicago, Illinois. The broker thereupon obtained 10 individual investors who formed a Wisconsin corporation named King Bee, Inc., with a capitalization of 150,000 shares of stock of $1 par value per share. None of the 10 investors had had prior experience in the restaurant or retail business and they were entirely unrelated to petitioner. On March 25, 1960, a lease agreement was entered into between Candies (the name of which had been changed by this time and which is referred to in the *61 lease as Lakeside) and Kitchens (the name of which had also been changed and which is referred to in the lease as 611), as lessors, and King Bee, Inc., as lessee. Therein it was recited that Lakeside was the owner of certain property (the property above-described which had originally cost it $161,981); that 611 was the lessee of such premises and the owner of certain buildings and improvements erected thereon and been operating the premises as a restaurant and retail sales business; and that King Bee, Inc., had requested Lakeside and 611 to cancel their existing lease. By the terms of the lease Lakeside and 611 leased the above properties, together with all buildings and appurtenances and furniture, fixtures and equipment to King Bee, Inc. to be used for the purpose of operating a restaurant, a motel, a farm, and a retail merchandise business. The term of the lease was 25 years from April 1, 1960 and provided for the payment of a rental of $40,000 annually, payable at the rate of $3,333.33 per month, plus five percent of all gross sales in excess of $800,000 annually. It was provided that 3/4 of each payment of rent should be paid to Lakeside and 1/4 to 611. The lessee was granted *62 the option to purchase, at any time until March 31, 1970, the premises (other than one parcel) and buildings and appurtenances thereon, together with the furniture and fixtures and equipment and machinery, for $775,000, or to purchase that portion of the demised premises which represented substantially that portion of the property on which Honey Bear Farm operation was carried on for $600,000. In the lease it was agreed between Lakeside and 611 that the existing lease between them should be suspended during the continuance of the lease with King Bee, Inc. They further agreed that in the event of the purchase by King Bee, Inc. of that portion of the property substantially constituting the property on which the Honey Bear Farm operation had been carried on, Lakeside should at that time pay 611 for all its right, title, and interest in the leased property a sum equal to the book value at which such interest was carried on the books and records of 611. In the joint income tax return which the petitioner and her husband filed for the taxable year 1955 there was reported long-term capital gain upon the sale of "Honey Bear Farm Enterprise" as follows: Honey Bear Farm Enterprise
Sold Jan. 2, 1955 for
$297,312.82
Acquired in 1951 - cost basis
197,312.82
Net gain
$100,000.00
*63 The respondent in the notice of deficiency held "that the gain of $100,000 reported by you on the sale of Honey Bear Farm in 1955 is taxable as ordinary income and not as a capital gain." At March 15, 1955, the date of the bill of sale, and at December 31, 1954, the date as of which the petitioner transferred the Honey Bear Farm business to Kitchens, any goodwill of such business did not have any fair market value, or did not have more than a nominal value. No part of the purchase price paid by Kitchens for the business was for goodwill. Opinion The petitioner transferred her going business, known as the Honey Bear Farm, in 1955 to Kitchens, a corporation of whose stock she owned 85 percent, and Kitchens assumed all her debts and obligations incurred in connection with such business. The petitioner concedes that she realized in 1955 a gain of $100,000 upon the sale, [2] but contends that such gain is attributable to the sale of goodwill, that the goodwill was a capital asset held for more than six months, and that, therefore, the gain is taxable as long-term capital gain. *64 The respondent's principal contention is that the business had no goodwill of any monetary value, that the gain of $100,000 resulted from the sale of physical assets which, in the hands of the transferee, constituted property of a character which is subject to the allowance for depreciation, and that therefore the gain is to be treated as ordinary income under section 1239 of the Internal Revenue Code of 1954, [3] since the petitioner owned more than 80 percent in value of the outstanding stock of the transferee. The respondent alternatively contends that as a result of the transaction, the petitioner received a taxable dividend of $100,000 from Kitchens. *65 The sale of a going business by a sole proprietor is not the sale of a single entity, but the sale of all the assets of which the business is composed; the selling price must be allocated to the various properties making up the business; and the character of the gain upon any particular asset is determined by the character of such asset. Williams v. McGowan (C.A. 2), 152 F. 2d 570, and Harry L. Bialock, 35 T.C. 649. See also Watson v. Commissioner, 345 U.S. 1003. And where consideration is paid for a mixed aggregate of assets, it is allocated among the several properties in accordance with their relative values. C. D. Johnson Lumber Corporation, 12 T.C. 348, and Harry L. Bialock, supra. Of the indebtedness of $410,118.59 assumed by Kitchens, we think that $111,304 should be allocated as selling price of the cash, accounts and note receivable, inventories, and prepaid insurance, since that was their aggregate face value. This leaves a balance of $298,814.59 to be allocated to any other assets transferred. The remaining assets shown in the balance sheet consisted of the fixed assets with an adjusted basis of $56,674.85 *66 and leasehold improvements with remaining unamortized cost of $141,339.94, a total of $198,014.79. As stated, the petitioner argues that of the $298,814.59 balance of the selling price, $198,014.79 should be allocated to these assets, and the remainder to goodwill. The balance sheet of the business as of December 31, 1954, did not carry any amount as representing the value of goodwill. The contract of sale, although reciting that goodwill was transferred, did not specify any amount of the selling price as attributable thereto. The resolution of the board of directors of Kitchens authorizing the purchase of the business stated that the assets and property, including the goodwill, was to be purchased "at the price stated in the balance sheet," plus the sum of $100,000 "which this Company considers to be a fair estimate of the value of the goodwill." However, considering the fact that the business sold was owned by the petitioner as the sole proprietor, that the purchaser, Kitchens, was controlled by the petitioner through her ownership of 85 percent of its stock, and that the indebtedness assumed by the purchaser was principally an indebtedness which the petitioner owed to another *67 corporation which she controlled, we think that the resolution of Kitchens, fixing $100,000 as the amount paid for goodwill, is entitled to little, if any, probative effect. We are not bound by an allocation made by either of the parties to the agreement. See Copperhead Coal Co., Inc. v. Commissioner (C.A. 6), 272 F. 2d 45, affirming a Memorandum Opinion of this Court. Rather, we think that under the circumstances we must determine whether the business possessed goodwill of any fair market value in order to make a proper allocation of the selling price among the various assets transferred. Neither party adduced any evidence specifically directed toward showing the fair market value at the date of sale of the fixed assets or the leasehold improvements. We have heretofore quoted with approval definitions of goodwill such as "the probability that the old customers will resort to the old place" and "all that good disposition which customers entertain towards the house of business, identified by the particular name or firm, and which may induce them to continue giving their custom to it" ( *68 Rodney B. Horton, 13 T.C. 143) and "The advantage or benefit which is acquired by an establishment, beyond the mere value of the capital, stocks, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers, on account of its local position, or common celebrity, or reputation from skill or affluence or punctuality, or from other accidental circumstances or necessities or even from ancient partialities or prejudices" ( D. K. MacDonald, 3 T.C. 720, and Malcolm J. Watson, 35 T.C. 203). The petitioner points to the fact that during the years she conducted the business the sales increased, resulting in gross sales of approximately $450,000 in the years 1953 and 1954, and argues that there must have been some goodwill from the custom or patronage which had been built up. While it is true that the petitioner apparently had a substantial patronage, we are concerned with whether this resulted in goodwill of any fair market value, or of more than a nominal value, for the purpose of determining whether it reasonably can be concluded that any portion of the selling *69 price should be allocated thereto. While the value of goodwill must be determined in the light of the facts in each particular case, and no specific rule is applicable in all cases (see D. K. McDonald, supra, and Estate of Robert R. Gannon, 21 T.C. 1073), it is well established that in determining such value the earning power of the business is an important factor. Thus, in George J. Staab, 20 T.C. 834, we stated: Whether the partnership business had any value greater than the value of its machinery depends upon the earning power of the partnership. If the partnership had any excess earning power that is the basis for computing its good will. See A.R.M. 34, 2 C.B. 31. Our prime concern here is arriving at a value of partnership good will, if any. Good will may be defined by the following formula: Good will equals a-b, where "a" is capitalized earning power and "b" is the value of assets used in the business. Good will, then, is an intangible consisting of the excess earning power of a business. A normal earning power is expected of the business assets, and if the business has greater earnings, then the business may be said *70 to have good will. This excess in earning power may be due to any one or more of several reasons, and usually this extra value exists only because the business is a going concern, being successful and profitable. Good will may arise from: (1) the mere assembly of the various elements of a business, workers, customers, etc., (2) good reputation, customers' buying habits, (3) list of customers and their needs, (4) brand name, (5) secret processes, and (6) other intangibles affecting earnings. The petitioner cites cases to the effect that a business may possess valuable goodwill even when, for a period of time, it operates without net profits, or at a loss, and cites particularly C. F. Hovey Co., 4 B.T.A. 175, as establishing a distinction between profits and goodwill. However, none of the cited cases stands for the proposition that a business has goodwill of fair market value if it has never had profits or any reasonable expectation of profits which may be attributable to goodwill. For example, in C. F. Hovey Co., supra, we stated: We think that the fact that the business of the C. F. Hovey Co. during the period 1909 to 1914 was not particularly profitable *71 does not prove that the good will did not have a cash value. The value of good will may not be indicated by the profits of a business for a short period. * * *
In determining that the good will of C. F. Hovey Co. had no value in September, 1914, the Commissioner considered the results of operations for a period of five years only. We think that no definite number of years can be made to apply to all cases. * * * * * * for the period from 1900 to 1914 the average yearly capital of the C. F. Hovey Co. was $1,404,595.44 and the average yearly earnings $171,951.83. If this period be taken as the basis for the computation of the value of the good will, instead of the five-year period used by the Commissioner, and an 8 per cent return be considered a fair return on tangibles, the excess average annual earnings for the period applicable to good will is $59,584.19, which capitalized upon a five-year purchase basis, as was done in the Appeal of St. Louis Screw Co., 2 B.T.A. 649, gives a value for the good will in excess of $200,000. During the years 1951 through 1954, the time that the petitioner operated the business, she sustained net losses ranging from about $40,000 *72 in 1951 to about $69,000 in 1954. Thus she was unable to obtain any return even upon her investment in tangible assets of the business. We recognize, of course, that a business may be expected to lose money at its inception, but here she had operated the business for four years and the record does not show that there was a reasonable prospect of realizing any earnings over and above a fair return upon the tangible assets. Indeed, in 1955 Kitchens, after taking over the business, sustained a loss of about $17,000, and although it did have earnings of about $15,000 in the year ended September 30, 1956, and about $7,500 in the period from October 1 to December 31, 1956, it continued to have operating losses in the years 1957, 1958, and 1959 in the respective amounts of approximately $16,000, $38,000, and $25,000. Under these circumstances, we are constrained to the view that at December 31, 1954, the time as of which the sale was effected, or at March 15, 1955, the date of the bill of sale, any goodwill of the business transferred did not have any fair market value, or did not have more than a nominal value, and we have so found as a fact. In consequence thereof, we conclude that no part *73 of the purchase price paid by Kitchens is properly allocable to goodwill. We have carefully considered the testimony of the petitioner's witness, Herbert M. Licht, who testified that in his opinion a fair value of the Honey Bear Farm property as of December 31, 1954, based upon its operations up to that time, would be $400,000, of which $100,000 would represent goodwill, but we conclude that it is of no probative force in the light of the other evidence of record. His experience had consisted of employment with a well known company operating hotels and restaurants and retail establishments in connection therewith. His opinion as to the value of goodwill was based upon either the concept that fair market value is to be attributed to goodwill irrespective of whether the business had earnings, or upon a projection of earnings which he made based upon the volume of business actually done by the Honey Bear Farm, but using cost percentages normal to the trade, which were far less than the petitioner's actual operating costs. His projected net profits ranged from $58,000 in 1954 to $104,000 in 1958. These, of course, are entirely out of line with the actual experience of the petitioner *74 and Kitchens, as set forth above. He conceded that there were certain factors in the Honey Bear Farm operation which were unknown to him and that the business could not succeed unless its operating costs were brought in line with normal costs in this type of business. The record does not establish that there was any reasonable expectation that such costs could be so reduced. We have also given consideration to the fact that in 1960 Candies and Kitchens entered into an agreement with King Bee, Inc., leasing to it for $40,000 per year the property which had been carried on as the Honey Bear Farm and, in addition, certain other property, and granting the lessee the option to purchase the Honey Bear Farm property for $600,000 at any time up to March 31, 1970. We agree with the respondent that the fixing of such an option price does not establish the value of the business at the time of the sale by petitioner five years earlier. Certainly it does not establish that at the time of the sale the business had goodwill of any fair market value. In view of the foregoing we conclude that the remainder of the selling price, $298,814.59, is properly allocable to the fixed assets and leasehold *75 improvements which were transferred, and that the gain derived is attributable to those assets. The adjusted basis, as shown on the balance sheet, of the fixed assets and the leasehold improvements is $198,014.79, and the gain is the difference between that amount and the amount of the purchase price properly allocable thereto, $298,814.59, or approximately $100,000. [4] In this connection we think it of some significance that the amount which the petitioner originally reported in her return as the selling price was $297,312.82, which closely approximates the portion of the selling price which we have concluded is attributable to the fixed assets and the leasehold improvements, and that the amount which she reported in her return as being the cost basis was $197,312.82, which closely approximates the adjusted basis of such assets as reflected on the balance sheet. The petitioner contends that if the gain is not attributable to the goodwill, *76 then some portion of the selling price, and therefore some part of the gain, should be attributed to the lease which she states was transferred by her to Kitchens. We note that the lease was not listed in the balance sheet of the business and that it was not specifically mentioned in either the bill of sale or the corporate resolution. While we do not doubt that the lease was transferred as a part of the assets of the business, there is no evidence that it had any fair market value or that the parties considered that it had, or that they intended any portion of the selling price to be attributed to it. Under section 1239 of the Code the gain realized by petitioner upon the transfer of the fixed assets and the leasehold improvements to Kitchens is to be considered as ordinary gain if such properties in the hands of the transferee are properties of a character which are subject to the allowance for depreciation provided in section 167. Kitchens, the transferee, continued to operate the business and use these properties therein. There is no evidence, and apparently no contention, that the fixed assets were not of a character subject to the allowance for depreciation in the hands of *77 Kitchens. The petitioner contends, however, that the leasehold improvements which were transferred had a useful life extending beyond the term of the lease and that, consequently, in the hands of Kitchens they were not of a character subject to the allowance for depreciation, but rather were subject to "amortization," the deduction for which would be taken under section 162 relating to ordinary and necessary business expenses, rather than under section 167 dealing with depreciation. She relies upon sections 1.167(a) and 1.162-11(b)(1) of the Income Tax Regulations.[5]
*78 We find it unnecessary to determine whether the petitioner is correct in her premise that leasehold improvements having a longer useful life than the remaining term of the lease are not to be considered as property of a character subject to the allowance for depreciation (see section 1.1239-1 of the Income Tax Regulations promulgated under section 1239 of the Internal Revenue Code of 1954), since the petitioner cannot here prevail for the reason that it has not been shown that the useful life of such improvements did extend beyond the remaining term of the lease. The only evidence which may bear upon the useful life of the leasehold improvements is the stipulation that the petitioner initially deducted the cost of such improvements over the 5-year period of the lease as originally written, but that after examination by the Internal Revenue Service the deduction period was increased to 12 years. Even if we assume that this establishes a useful life of 12 years, the evidence still does not establish that such life extended beyond the term of the lease. It is quite apparent that the term of the lease was extended, but for how long a period is not shown. Kitchens *79 continued to operate Honey Bear Farm under the lease until 1960 and Kitchens and Candies in their joint lease to King Bee, Inc., executed in 1960, referred to the existing lease, and both of them granted a lease to King Bee, Inc. for 25 years commencing April 1, 1960. In such lease Kitchens leased to King Bee, Inc. the leasehold improvements which it had acquired from the petitioner. It thus appears that the petitioner and her two controlled corporations disregarded the original term of the lease, and insofar as the record shows, the lease was of indefinite duration. As stated in Highland Hills Swimming Club, Inc. v. Wiseman (C.A. 10), 272 F. 2d 176, any leasehold improvement is to be depreciated over its useful life where the lease is for an indefinite duration. Under the circumstances, we conclude that both the fixed assets and the leasehold improvements constituted property of a character subject to the allowance for depreciation, and that under section 1239 the gain derived upon the sale thereof is to be considered as gain from the sale of property which is neither a capital asset nor property described in section 1231 - that is, it is to be considered as ordinary *80 gain, as determined by the respondent. In view of the foregoing, it becomes unnecessary to consider the alternative contention of the respondent that the transaction between the petitioner and Kitchens constituted the payment of a taxable dividend of $100,000 to petitioner. The petitioner in her petition alleged error on the part of the respondent in disallowing a claimed bad debt deduction. However, this issue was not mentioned by the petitioner at the hearing or on brief and we assume that it has been abandoned. In any event, there is no evidence to show that the respondent erred in disallowing such claimed deduction. Decision will be entered for the respondent. Footnotes
1. The net losses shown were deducted in the joint income tax returns which petitioner and her husband filed for each of the years 1951 through 1954. The adjusted gross income reported in the joint returns for each of those years was, respectively, $105,027.05; $102,796.40; $108,894.22; and $147,388.23.↩
*. The petitioner originally claimed deductions attributable to leasehold improvements over the term of the 5-year term of the lease, but after examination of her income tax return by the Internal Revenue Service the deduction period was increased to 12 years. The adjustments shown represent, either in whole or in part, the adjustment of this deduction.↩
2. The consideration for the sale was the assumption by Kitchens of the petitioner's liabilities in the amount of $410,118.59. The amount of indebtedness assumed by a purchaser constitutes an amount realized by the seller upon a sale, within the meaning of section 1001(b) of the Internal Revenue Code of 1954. See Crane v. Commissioner, 331 U.S. 1, Brons Hotels, Inc., 34 BTA 376, Walter F. Haass, 37 BTA 948, and W. H. Weaver, 32 TC 411, affd. (CA-4), 281 F. 2d 738↩.
3. Section 1239 provides: (a) Treatment of Gain as Ordinary Income. - In the case of a sale or exchange, directly or indirectly, of property described in subsection (b) - (1) between a husband and wife; or (2) between an individual and a corporation more than 80 percent in value of the outstanding stock of which is owned by such individual, his spouse, and his minor children and minor grandchildren; any gain recognized to the transferor from the sale or exchange of such property shall be considered as gain from the sale or exchange of property which is neither a capital asset nor property described in section 1231. (b) Section Applicable only to Sales or Exchanges of Depreciable Property. - This section shall apply only in the case of a sale or exchange by a transferor of property which in the hands of the transferee is property of a character which is subject to the allowance for depreciation provided in section 167.↩
4. The actual difference is $100,799.80. The excess of $799.80 is not explained, but we attribute no significance thereto since neither party does, and since the respondent does not claim that petitioner derived gain in excess of $100,000.↩
5. Section 167(a)-4 provides in part: § 1.167(a)-4 Leased Property. - Capital expenditures made by a lessee for the erection of buildings or the construction of other permanent improvements on leased property are recoverable through allowances for depreciation or amortization. If the useful life of such improvements in the hands of the taxpayer is equal to or shorter than the remaining period of the lease, the allowances shall take the form of depreciation under section 167. See §§ 1.167(b)-0, 1, 2, 3, and 4 for methods of computing such depreciation allowances. If, on the other hand, the estimated useful life of such property in the hands of the taxpayer, determined without regard to the terms of the lease, would be longer than the remaining period of such lease, the allowances shall take the form of annual deductions from gross income in an amount equal to the unrecovered cost of such capital expenditures divided by the number of years remaining of the term of the lease. Such deductions shall be in lieu of allowances for depreciation. See section 162 and the regulations thereunder. * * * Section 1.162-11(b)(1) provides: (b)(1) The cost to a lessee of erecting buildings or making permanent improvements on property of which he is the lessee is a capital investment, and is not deductible as a business expense. If the estimated useful life in the hands of the taxpayer of the building erected or of the improvements made, determined without regard to the terms of the lease, is longer than the remaining period of the lease, an annual deduction may be made from gross income of an amount equal to the total cost of such improvements divided by the number of years remaining in the term of the lease, and such deduction shall be in lieu of a deduction for depreciation. If, on the other hand, the useful life of such buildings or improvements in the hands of the taxpayer is equal to or shorter than the remaining period of the lease, this deduction shall be computed under the provisions of section 167 (relating to depreciation). Where there is a possibility that the lease may be renewed, the matter of spreading such costs over the term of the original lease, together with the renewal period or periods, depends upon the facts in the particular case, including the presence or absence of an option of renewal and the relationship between the parties. As a general rule, unless the lease has been renewed or the facts show with reasonable certainty that the lease will be renewed, the cost or other basis of the lease, or the cost of improvements shall be spread only over the number of years the lease has to run without taking into account any right of renewal.↩