ARTHUR G. RUDD, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6162–77.    Filed August 9, 1982.

*Louis W. Kasischke,* for the petitioner.
*Thomas E. Ritter,* for the respondent.

CHABOT, *Judge*: Respondent determined a deficiency in Federal individual income tax against petitioner for 1971 in

the amount of $17,098. The issue for decision is whether petitioner is entitled to a loss deduction under section 165[1] in 1971 for abandonment of a partnership name and, if so, in what amount.

## FINDINGS OF FACT

Some of the facts have been stipulated; the stipulation and the stipulated exhibits are incorporated herein by this reference.

When the petition in this case was filed, petitioner resided in Fruitport, Mich.

Maihofer, Moore & DeLong (hereinafter sometimes referred to as the partnership) was formed by Raymond C. Maihofer, C. Claire Moore, and Wesley DeLong (hereinafter sometimes referred to individually, as Maihofer, Moore, and DeLong, respectively, and collectively as the name "partners") on November 1, 1932, to engage in the practice of public accounting in the Muskegon, Mich., area.

The partnership maintained its primary office in Muskegon and drew clients from an area along the Lake Michigan shoreline which extends from South Haven, Mich. (approximately 60 to 65 miles south of Muskegon), to Charlevoix, Mich. (approximately 180 miles north of Muskegon). Clients were considered clients of the partnership rather than clients of individual partners or employees. Audit reports (including reports of cities, school districts, and townships) and tax returns prepared by the partnership's partners and employees regularly carried the partnership's name.

The partnership's name was well recognized in the Muskegon area. The reputation associated with the partnership's name attracted new clients to the partnership. New clients also were referred to the partnership by existing clients. The partnership encouraged its professionals to participate in speaking engagements to keep the partnership's name in front of the public. After the partnership's name had remained the same for about 25 years, the partners voted down an attempt

---

[1]Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the year in issue.

by a partner, J. Roger Holmstrom (hereinafter sometimes referred to as Holmstrom), to add his name to the partnership's name because they feared that any change in the name might jeopardize the partnership's business.

The name partners were also partners with William P. DeLong in another partnership (hereinafter sometimes referred to as the Holland firm) which was engaged in the practice of public accounting in Holland, Mich., approximately 35 miles south of Muskegon. The Holland firm used the same name as the partnership from the late 1940's into the 1970's. The name partners did not perform any services for the Holland firm, but shared in its net profits in return for the use of the name.

Before December 30, 1967, the partnership operated without a written partnership agreement. On that date, all the then partners executed a written partnership agreement, which provides, in part, as follows:

### PARTNERSHIP AGREEMENT

AGREEMENT made December 30, 1967, effective as of January 1, 1967, between RAYMOND C. MAIHOFER, C. CLAIRE MOORE, WESLEY DeLONG, J. R. HOLMSTROM, JAMES I. MISH, ARTHUR G. RUDD, EDWARD N. NAPERALSKY and RONALD W. DeLONG.

### I

#### NAME AND BUSINESS

Some of the parties have, for a period of many years, conducted a partnership for the practice of public accounting, but without a written agreement. The parties hereto are the present partners and herein reduce their understandings to writing. The name shall continue to be "MAIHOFER, MOORE & DeLONG" and their principal office shall continue on the 4th floor of the Hackley Union National Bank Building, Muskegon, Michigan.

\*    \*    \*    \*    \*    \*    \*

### V

#### MANAGEMENT, DUTIES, FEES AND RESTRICTIONS

\*    \*    \*    \*    \*    \*    \*

No partner shall, directly or indirectly, engage in any other business or occupation without the consent of the other partners; provided, that Raymond C. Maihofer, C. Claire Moore and Wesley DeLong may continue as partners of MAIHOFER, MOORE & DeLONG of Holland, Michigan, but shall not, hereafter, be more active in the affairs of that partnership than they have been heretofore.

\*    \*    \*    \*    \*    \*    \*

## IX

### Voluntary Withdrawal

\*       \*       \*       \*       \*       \*       \*

The value of the withdrawing partner's interest in the partnership shall be paid to him at such times and shall be computed in such manner (and his interest shall be assigned) as is provided herein upon the death of a partner under the assumption he died on the date of withdrawal; provided, the value assigned to goodwill shall be reduced by half; and provided, further, that if he withdraws to accept employment by a client or former client of this partnership, no value shall be assigned to goodwill.

## X

### Retirement (Partners Emeritus)

\*       \*       \*       \*       \*       \*       \*

The value of each of the partner's interest [released due to retirement] shall be paid to him at such times and shall be computed in such manner (and his interest shall be assigned) as is provided herein upon the death of a partner under the assumption he died on the date of such release.

\*       \*       \*       \*       \*       \*       \*

## XI

### Death

\*       \*       \*       \*       \*       \*       \*

The value of the deceased partner's interest shall be his undrawn earnings, any salary due him, his share of net profits to the time of death, his share of work in process (based on appraisal by the surviving partners), the book value of his capital interest and his share of goodwill (based upon goodwill for the entire partnership of $140,000 or such other figure as may hereafter be set forth in the schedule at the end of this agreement and initialled by the partners).

\*       \*       \*       \*       \*       \*       \*

## XIV

### Competition

After the voluntary withdrawal or the retirement of any partner, he shall not, without the consent of the partners, for a period of five years, and within a radius of 75 miles of Muskegon, Michigan, engage in the public accounting profession (or, after retirement, become employed by a client of the partnership); provided, this shall not preclude Raymond C. Maihofer, C. Claire Moore and Wesley DeLong from continuing as partners of Maihofer, Moore & DeLong of Holland, Michigan, as hereinabove provided.

## XV

### COMMON DISASTER

All of the foregoing provisions for sale on death shall be voidable by the partnership in the event partners having 40% or more of the capital interests shall die within a period of ninety (90) days.

If such provisions are voided, the partnership shall stand dissolved and the surviving partners shall proceed diligently to wind up the affairs of the partnership. The partnership name may be disposed of as a part of the assets, but, should any two or more of the surviving partners organize a new firm, they may not, unless they have purchased the name, continue to use the partnership name or refer to it in any manner in connection with the organization or operation of the new partnership.

The partnership filed its Federal income tax information returns on a calendar year basis using the accrual method of accounting. The partnership did not make the election provided by section 754.[2] The partnership maintained "fixed capital" and "undrawn earnings" accounts for each partner.[3] Each partner's share of partnership earnings[4] was credited to his undrawn earnings account, and withdrawals were charged to this account. The prices for purchased partnership interests were recorded in the fixed capital accounts. The partnership recorded goodwill on its books (see note 2 to table 1 *infra*) and reported goodwill as an asset on the balance sheet of its tax returns for 1955 through 1971. However, the partnership, itself, paid nothing for the goodwill so recorded or reported.

Petitioner was employed by the partnership in 1952 as a staff accountant; he became a partner in 1958. Beginning in 1958 and from time to time through 1971, petitioner purchased interests in the partnership from the name partners.[5] The amounts paid by petitioner for his interests exceeded the proportionate share of the net book value of the partnership's net assets excluding goodwill. The excess amounts were

---

[2]The text of sec. 754 is set forth at note 28 *infra*.

[3]Before 1970, only one capital account was maintained for each partner.

[4]Under the written partnership agreement, the partnership's profits and losses (after provision for salaries) were shared according to capital interest ownership. Partners who no longer owned a capital interest in the partnership (retired partners or partners emeritus) were compensated for any services performed for the partnership by salary.

[5]During this period, similar purchases of interests in the partnership were made by Holmstrom and James I. Mish (hereinafter sometimes referred to as Mish). In 1965, a 10-percent interest was purchased by Edward N. Naperalsky (hereinafter sometimes referred to as Naperalsky).

considered payments for goodwill. Petitioner's purchases are summarized in table 1.

TABLE 1

| Year | Percent purchased | Purchase price | Proportionate share of net book value of net assets excluding goodwill[1] | Premium paid for goodwill[2] |
|------|------|------|------|------|
| 1958 | 10 | $20,000 | $10,600 | $9,400 |
| 1965 | 5 | 12,300 | 5,300 | 7,000 |
| 1967 | 5 | 12,300 | 5,300 | 7,000 |
| 1969 | 1⅔ | 4,100 | 1,767 | 2,333 |
| 1970 | 1⅔ | 4,100 | 1,767 | 2,333 |
| 1971 | 3⅓ | 8,200 | 3,533 | 4,667 |
| | 26⅔ | 61,000 | 28,267 | 32,733 |

[1] The net book value of the partnership's net assets excluding goodwill equaled $106,000 when petitioner made each of his purchases of an interest in the partnership. The parties have stipulated that this $106,000 was equal to the fair market value of the partnership's net assets excluding goodwill.

[2] Total goodwill recorded on the books of the partnership was $94,000 when petitioner purchased his interest in 1958, and $140,000 when petitioner purchased his remaining interests.

In each year that petitioner purchased his interests (see table 1 *supra*), the fair market value of the net assets of the partnership (excluding money but including goodwill) exceeded 110 percent of the total adjusted basis of these net assets to the partnership.[6]

While petitioner was associated with the partnership, it grew from three partners and 8 to 10 staff accountants in 1952 to six partners, 20 to 26 staff accountants, and two retired partners (who remained active in the practice to some extent) in 1971. From about 1958 until it was dissolved in 1971, the partnership was the largest accounting firm in Muskegon. From 1958 to 1970, the partnership's gross receipts tripled.

In June or July of 1971, petitioner, Holmstrom, and Mish became interested in associating with Alexander Grant & Co. (hereinafter sometimes referred to as Alexander Grant), a national and international public accounting firm that had established an office in Muskegon in 1969. They believed that association with a national public accounting firm would enable them to better cope with auditing and reporting

[6] So the parties have stipulated. The amounts by which fair market values exceeded book values are accounted for entirely by goodwill.

standards and procedures, training of personnel, and current developments in the law and in the accounting profession in general.

By Agreement of Dissolution of Partnership (hereinafter referred to as the dissolution agreement), executed on October 1, 1971, the partnership was terminated as of that date and dissolved in 1971, except for the winding up of the partnership's affairs. The partnership's last taxable year was 1971.

Of the name partners, only DeLong had a capital interest in the partnership on October 1, 1971.[7] Under the terms of the dissolution agreement relating to the name partners: (1) DeLong's 5-percent capital interest was purchased by petitioner, Holmstrom, and Mish,[8] (2) amounts payable to the name partners on account of their undrawn earnings were to be paid to them out of the partnership's assets by specified dates (if these payables were not so paid, petitioner, Holmstrom, and Mish were to execute individual promissory notes for the unpaid amounts), (3) the name partners' interests in the partnership terminated as of December 31, 1971, if certain payments had been made and promissory notes had been delivered to them, and (4) the name partners agreed to be bound by article XIV of the partnership agreement, *supra*, restricting the partners in the practice of public accounting in the Muskegon area and employment by the partnership's clients.

The dissolution agreement provided that Naperalsky and Ronald W. DeLong[9] (1) were to be paid their capital accounts and undrawn earnings accounts out of the partnership's assets by December 31, 1971 (if these accounts were not so paid, petitioner, Holmstrom, and Mish were to execute individual promissory notes for the unpaid amounts), and (2) were each to receive 10 percent of the partnership's remaining net assets at the conclusion of the winding up of the partnership's affairs.

---

[7]Moore retired on Jan. 1, 1967, and Maihofer retired on Dec. 31, 1970. After their retirements, both remained active in the partnership's practice to some extent as "partners emeritus," but no longer owned a capital interest in the partnership.

[8]In 1971, petitioner, Holmstrom, and Mish also acquired the last 5-percent interest of Maihofer in the partnership.

[9]Ronald W. DeLong acquired a 10-percent interest in the partnership in 1965 as a gift from his father, DeLong.

Petitioner, Holmstrom, and Mish were each to receive 26⅔ percent (see table 1 *supra*) of the partnership's remaining net assets at the conclusion of its winding up.

The assets of the partnership at the time of dissolution consisted primarily of cash, accounts receivable (billed and unbilled), office furniture and fixtures, and goodwill. At the time of dissolution, the furniture and fixtures had an adjusted basis to the partnership and a fair market value equal to $14,428.

According to the dissolution agreement, on October 1, 1971, petitioner, Holmstrom, and Mish were to transfer and assign to Alexander Grant assets of the partnership having an aggregate value of $159,000—in particular, the partnership's fixed assets (furniture and fixtures), unbilled time,[10] and (to the extent necessary) accounts receivable. In fact, fixed assets and accounts receivable of the partnership exceeding $159,000 were transferred to Alexander Grant.

Schedule L of the partnership's 1971 tax return showed the following assets of the partnership as of the end of the taxable year:

| | |
|---|---|
| Cash | $148,236 |
| Accounts receivable | 79,686 |
| Other | 1,560 |
| Total | 229,482 |

Table 2 shows the costs[11] of each of the indicated partners' interests in the partnership immediately before the partnership's dissolution.

TABLE 2

| Partner | Cost of interest in the partnership |
|---|---|
| Petitioner | $61,000 |
| Holmstrom | 59,951 |

---

[10]No unbilled time was transferred to Alexander Grant.

[11]The parties have stipulated that the amounts shown in table 2 are the partners' tax bases in their interests in the partnership. However, Exhibits 13-M and 9-I make it evident that the table 2 amounts are merely cost bases (except that the amount for Ronald W. DeLong may represent the cost basis to DeLong of the 10-percent interest he gave to Ronald W. DeLong) and do not reflect adjustments to basis that sec. 705 requires be made.

| | |
|---|---|
| Mish .................................. | $61,000 |
| Naperalsky .......................... | 24,600 |
| Ronald W. DeLong ................. | 10,600 |
| Total .............................. | 217,151 |

A deduction for loss of goodwill in the amount of $111,900[12] was claimed on the partnership's 1971 tax return. Petitioner reported his distributive share of partnership income (which had been reduced for the loss of goodwill) on his 1971 Federal individual income tax return.

Under the dissolution agreement, petitioner and the other partners listed in table 2 acquired the rights to the partnership's name. They abandoned the use of the partnership's name in 1971.

After entering into the dissolution agreement, petitioner, Holmstrom, and Mish acquired partnership interests in Alexander Grant, and Naperalsky and Ronald W. DeLong were employed by Alexander Grant as managers; the name partners did not associate with Alexander Grant in any manner. All of the staff accountants who worked for the partnership before the dissolution also became employees of Alexander Grant. These employees were aware of the pending dissolution of the partnership only about 2 weeks to 1 month before October 1, 1971. The partnership's clients were notified that petitioner, Holmstrom, and Mish had become partners in Alexander Grant.

There were no written or oral agreements concerning any kind of merger between the partnership and Alexander Grant. Alexander Grant's Muskegon office had four partners, no managers, and about 8 to 10 staff accountants when the partnership's above partners and employees joined Alexander Grant. No significant net changes in numbers of staff accountants were experienced after Alexander Grant employed the partnership's staff.

On December 1, 1975, petitioner withdrew from Alexander Grant and set up a new practice of his own. At that time, petitioner investigated the feasibility of using the partner-

---

[12]Total goodwill recorded on the partnership's books in 1971 was $140,000. The $111,900 amount represents the excess amounts paid by petitioner and three other partners for interests in the partnership (see note 5 and accompanying text *supra*).

ship's name in his new practice. He believed that the name was still a valuable asset if it could be used. Petitioner did not reuse the partnership's name, however, because he was advised that any use of the name by him would be illegal.

The partnership's name was a valuable asset of the partnership; the portion of the partnership's goodwill that was embodied in the partnership's name was 20 percent when petitioner purchased his interests in the partnership.

Goodwill also existed in the form of customer patronage and other intangibles that were not abandoned during 1971.

## OPINION

The parties agree that goodwill was an asset of the partnership and that petitioner and four other partners acquired the rights to the partnership's name upon dissolution of the partnership. The parties disagree, however, as to the composition of the partnership's goodwill and the tax consequences of abandoning the use of the partnership's name.

Petitioner contends that the partnership's goodwill was embodied entirely in the partnership's name and therefore, when the use of the partnership's name was abandoned in 1971, a loss of goodwill occurred for which petitioner (having obtained a portion of the partnership's goodwill as a liquidating distribution) is entitled to a deduction under section 165(a) for his entire basis in the goodwill.[13] Respondent maintains that the partnership's goodwill consisted of its clients and, since the business of the partnership was continued after its dissolution without the loss of clients, there was no abandonment of goodwill. In the alternative, respondent asserts that not all of the partnership's goodwill was abandoned, and

---

[13]The partnership claimed a deduction of $111,900 for loss of goodwill on its 1971 tax return. As a result, the distributive share of the partnership's income reported by petitioner on his 1971 income tax return included a portion of this deduction for loss of goodwill. The partnership was not entitled to such a deduction, however, since it had no tax basis in goodwill (in the absence of a sec. 754 election and basis adjustment under sec. 743(b)). Petitioner conceded at trial that the manner in which the loss of goodwill was originally reported was improper, and relies solely on the position stated in the text, *supra.* Respondent does not contend he was surprised by petitioner's shift. Petitioner, of course, retains the burden of proof. We proceed to consider petitioner's new position. *Estate of Stark v. Commissioner,* 45 B.T.A. 882, 891 (1941).

In view of the stipulation of the parties that the partners abandoned the partnership's name, we are not called upon to decide whether the partnership or the partners (including petitioner) abandoned the use of the partnership's name.

petitioner has failed to establish what portion of the goodwill was abandoned. Respondent further contends that, if we find that goodwill was abandoned in any amount, then (1) section 731(a)(2) operates to deny recognition in 1971 of the loss from such abandonment, or (2) any abandonment loss recognizable by petitioner is a capital loss pursuant to section 731(a), rather than an ordinary loss.

We agree with petitioner that he is entitled to a loss deduction in 1971 for the abandonment of his interest in the partnership's name, but we do not agree that the partnership's goodwill was embodied entirely in the partnership's name. Accordingly, the amount of petitioner's loss deduction is determined herein.

Goodwill may be defined as an intangible (or group of intangibles) associated with the going-concern value of a business. The abandonment of a component of goodwill which is a clearly identifiable and severable asset entitles the taxpayer to a loss deduction under section 165(a).[14] *Massey-Ferguson, Inc. v. Commissioner*, 59 T.C. 220, 225 (1972), and cases cited therein.

The facts and circumstances of the instant case convince us that the partnership's name was a clearly identifiable and severable asset of the partnership which contributed to the partnership's goodwill.

When it was dissolved in 1971, the partnership had been in business in the Muskegon area for almost 40 years, and it was the largest accounting firm in the area. The partnership attracted clients from all along the Lake Michigan shoreline. The partnership's name was well recognized in the area and the partners feared that business might be hurt if the partnership's name was changed in any way. In some in-

---

[14]SEC. 165. LOSSES.

(a) GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

Sec. 1.165–2(a), Income Tax Regs., provides in pertinent part, as follows:

"A loss incurred in a business or in a transaction entered into for profit and arising from the sudden termination of the usefulness in such business or transaction of any nondepreciable property, in a case where such business or transaction is discontinued or where such property is permanently discarded from use therein, shall be allowed as a deduction under section 165(a) for the taxable year in which the loss is actually sustained. * * * "

Respondent does not contend that sec. 165(c) (relating to losses of individuals) limits the deductibility of any loss deduction otherwise allowable to petitioner.

stances, the partnership's name attracted new clients. When an effort was made by one partner to add his name to the partnership's name, the other partners refused. A certified public accountant in Holland, Mich., 35 miles south of Muskegon, shared the net profits of his accounting firm for longer than 20 years solely for the use of the partnership's name. Petitioner also adduced testimony as to the importance of a firm name in the public accounting industry, at least in Michigan. This testimony indicated that, in general, firms with well-established names become less successful if they change their names; and in some instances, firms with well-established names can continue to be successful despite turnover of personnel or even despite a lower quality of services rendered.

The foregoing factors collectively lead us to conclude that the partnership's name was a clearly identifiable and valuable intangible asset of the partnership which was responsible, to some extent, for client attraction and retention.

Petitioner is entitled to a deduction in the amount of his basis in the partnership's name for 1971, the year in which the name was abandoned. *Massey-Ferguson, Inc. v. Commissioner, supra.* However, as more fully discussed, *infra*, the partnership's name was not the only intangible accounting for the partnership's goodwill.

Before examining how the amount of the deductible abandonment loss is to be determined, we will consider respondent's alternative arguments.

Respondent states that he "does not here contest that some of the goodwill of [the partnership] was tied directly to the name of the firm." Nevertheless, he asserts that "petitioner has failed to establish what portion of the goodwill was abandoned" and so is entitled to no deduction at all. In so arguing, respondent has overlooked the fact that value of abandoned property at the time of abandonment has little if any effect on deductibility. Deductibility depends on the fact of abandonment of the partnership's name (not the goodwill) and a determination of petitioner's basis in the partnership's name. The partnership's name was abandoned in 1971, and we are obligated to determine the amount of the name's deductible basis. See *Commissioner v. Maresi*, 156 F.2d 929, 931 (2d Cir. 1946) ("The one sure way to do injustice * * * is to allow

nothing whatever upon the excuse that we cannot tell how much to allow"). We reject respondent's argument that no deduction whatsoever is allowable merely because petitioner has failed to establish the precise amount that is allowable.

Respondent argues that section 731(a)(2) precludes recognition of any loss by petitioner. Section 731(a)(2)[15] provides the rule for recognition of loss *on a distribution* by a partnership to a partner. As petitioner correctly points out, petitioner's claim is for a loss arising from the abandonment of the partnership's name by petitioner *after* he received an interest in the name as a distribution from the partnership—petitioner does not claim a loss on the distribution. Accordingly, we conclude that section 731 does not apply, and so this provision does not preclude recognition of petitioner's loss.[16]

Respondent further argues that goodwill "constituted an integral and indivisible part of the petitioner's partnership interest" and therefore the partnership "could not separately distribute the goodwill to the various partners." We disagree. Goodwill, though an intangible, may be sold, exchanged, disposed of, and even abandoned, like any other asset. In any event, we have found the partnership's name to be a clearly identifiable and severable asset, and we reject respondent's assertion that it was not capable of being distributed to the partners.

Petitioner maintains that his entire basis in the partnership's goodwill is embodied in the partnership's name, and all of it was abandoned in 1971, and, so, all of it is deductible for

---

[15]SEC. 731. EXTENT OF RECOGNITION OF GAIN OR LOSS ON DISTRIBUTION.
(a) PARTNERS.—In the case of a distribution by a partnership to a partner—

\*    \*    \*    \*    \*    \*    \*

(2) loss shall not be recognized to such partner, except that upon a distribution in liquidation of a partner's interest in a partnership where no property other than that described in subparagraph (A) or (B) is distributed to such partner, loss shall be recognized to the extent of the excess of the adjusted basis of such partner's interest in the partnership over the sum of—
(A) any money distributed, and
(B) the basis to the distributee, as determined under section 732, of any unrealized
receivables (as defined in section 751(c)) and inventory (as defined in section 751(d)(2)). Any gain or loss recognized under this subsection shall be considered as gain or loss from the sale or exchange of the partnership interest of the distributee partner.
[16]In view of our conclusion that sec. 731(a)(2) does not apply to petitioner's loss on abandonment, we do not separately address each of respondent's arguments based on that provision.

1971. Respondent asserts that no deduction is to be allowed. We believe the correct answer lies between the parties' positions.[17]

The goodwill of a public accounting firm can generally be described as the intangibles that attract new clients and induce existing clients to continue using the firm. These intangibles may include an established firm name, a general or specific location of the firm, client files and workpapers (including correspondence, audit information, financial statements, tax returns, etc.), a reputation for general or specialized services, an ongoing working relationship between the firm's personnel and clients, or accounting, auditing, and tax systems used by the firm. See *Masquelette's Estate v. Commissioner*, 239 F.2d 322, 325–326 (5th Cir. 1956), revg. a Memorandum Opinion of this Court;[18] *Butler v. Commissioner*, 46 T.C. 280 (1966); *Brooks v. Commissioner*, 36 T.C. 1128, 1133 (1961); *Watson v. Commissioner*, 35 T.C. 203, 214 (1960); *Wyler v. Commissioner*, 14 T.C. 1251, 1259 (1950); *Horton v. Commissioner*, 13 T.C. 143 (1949).

We are convinced that there were other transferable intangibles associated with the partnership's business which contributed to client patronage. These intangibles included the following: a base of clients requiring ongoing or recurring services by the partnership, client files and workpapers, a working relationship between the partnership's personnel and clients, and a long-standing reputation for accounting services in the Muskegon area. Moreover, we do not believe that these intangibles were abandoned when the partnership was dissolved.

---

[17]In *Watson v. Commissioner*, 35 T.C. 203 (1960), respondent made the argument "that the goodwill of a professional man may not be split into parts with a portion being conveyed and a portion retained." 35 T.C. at 214. We rejected the argument there, and we reject it here, even though this all-or-nothing approach appears to be adopted by both parties in the instant case.

[18]T.C. Memo. 1955–221.

In *Masquelette's Estate v. Commissioner*, 239 F.2d 322, 325 (5th Cir. 1956), respondent argued that there was "no sale of the good will at all, primarily because of the denial to the purchasers of the right to use Masquelette's name." The Court of Appeals rejected this argument. In the instant case, apparently shifting to the other extreme, respondent maintains that all of the basis for goodwill must be allocated away from the abandoned name and to the elements of goodwill that petitioner and the other parties carried with them to Alexander Grant.

The partnership was terminated as of October 1, 1971, and dissolved in 1971, except for the winding up of its affairs. On that same date, the partnership's five most active partners and all of its staff accountants began working for Alexander Grant. The remaining three partners (the name partners) had agreed not to engage in the practice of public accounting in the Muskegon area for specified periods of time. Also on October 1, 1971, the partnership's fixed assets were transferred to Alexander Grant. The record does not indicate who had the right to contact the partnership's clients or to use client files and workpapers. We doubt that Alexander Grant would employ the entire accounting staff of the partnership (except for the name partners) and obtain all of its fixed assets unless a substantial portion of the partnership's business was to be continued by Alexander Grant. It is highly unlikely that Alexander Grant's Muskegon office was growing so rapidly that it could absorb in its own practice a two-to-threefold increase in its partners and staff of accountants. Neither do we think that petitioner would turn his back on a client base developed over a 39-year period, including 19 years of his own efforts, for which he paid a large premium. Integral to the continuation of the partnership's business, we think, were the partnership's other intangibles, discussed *supra.* In any event, petitioner, who bears the burden of proving how much of the basis for goodwill should be allocated to the partnership's name, has not convinced us that these intangibles were abandoned or otherwise lost their usefulness on the dissolution of the partnership.[19]

As detailed *infra,* petitioner's adjusted basis in the partnership's goodwill (and derivatively, in the partnership's name) must be determined under the special basis rule provided in section 732(d). This rule requires that we look at the assets of a partnership at the time a partnership interest is purchased by the transferee partner who is to receive the special basis adjustment or allocation under section 732(d). Sec. 1.732–1(d)(1)(vi), Income Tax Regs. See sec. 743(b) and the regulations

---

[19]In this regard, we note that petitioner's witness testified that, in general, professional firms with well-established names will take precautions to ensure that their clients and the public are aware of any modification or change of firms' names. Indeed, the clients of the partnership were notified that petitioner had become a partner in Alexander Grant.

thereunder. Accordingly, in determining the portion of goodwill associated with the partnership's name, we must examine the partnership's goodwill as of the date petitioner purchased each of his interests in the partnership. See *Webster Investors, Inc. v. Commissioner*, 291 F.2d 192 (2d Cir. 1961), affg. a Memorandum Opinion of this Court.[20]

We are convinced that the partnership's name was a significant component of its goodwill. When petitioner purchased his first interest (10 percent) in the partnership, it had been in existence for almost 26 years. About that time, the partnership became the largest public accounting firm in the Muskegon area and maintained that position until its dissolution. Its reputation was well established in the area throughout the years when petitioner was purchasing his interests. Also throughout this period, a certified public accountant in Holland, Mich., shared his net profits with the name partners solely for the use of the partnership's name.

On the other hand, we believe a substantial portion of the partnership's goodwill was embodied in its client relationships. Under the written partnership agreement of 1967, the voluntary withdrawal of a partner would result in a forfeiture of 50 to 100 percent of the goodwill attributable to the partner's interest, depending on whether or not the withdrawing partner intended to accept employment with a client or former client. The partnership agreement prohibited any partner from practicing public accounting within a 75-mile radius of Muskegon for 5 years after the partner voluntarily withdrew or retired, and also forbade any partner from being employed by a client after retirement. In our view, these provisions of the partnership agreement were intended to protect the partnership's client base and business relationship with clients, which we have concluded were intangibles contributing to the partnership's goodwill. On dissolution of the partnership, the name partners remained subject to the restrictions on competition in the Muskegon area and employment by clients. This, too, was a measure taken to protect the partnership's client base. It is evident that the partners set a

---

[20]T.C. Memo. 1960–74.

high value on those components of goodwill other than the partnership's name.

"In a case such as this, 'an accurate allocation of value among the several classes of intangibles is impossible, and we must make the broadest kind of estimate.'" *Forward Communications Corp. v. United States*, 221 Ct. Cl. 582, 608 F.2d 485, 504 (1979). Using our best judgment and taking into consideration the foregoing factors, we have found that, overall, the portion of the partnership's goodwill that was embodied in the partnership's name was 20 percent when petitioner purchased his interests in the partnership.

We conclude that the partnership's name was a clearly identifiable and severable asset. Since petitioner and four other partners received this asset in 1971 as a distribution from the partnership under the terms of the dissolution agreement and abandoned it in that year, we hold that petitioner is entitled to an abandonment loss deduction under section 165(a) for 1971.[21]

Under section 165(b),[22] the amount of petitioner's loss deduction is measured by his adjusted basis[23] in the partnership's name. The following recounts our journey through subchapter K of the Internal Revenue Code of 1954 in search of petitioner's adjusted basis in the partnership's name.

Petitioner received accounts receivable, furniture and fixtures, intangible assets (the partnership's name and other elements encompassed in goodwill), and money in liquidation of his interest in the partnership. Under section 732(b),[24] the

---

[21]It does not follow that business name changes automatically give rise to abandonment deductions. In the instant case, the parties have stipulated that the partnership's name was abandoned. See *Massey-Ferguson, Inc. v. Commissioner*, 59 T.C. 220, 225–226 (1972). We express no views on what evidence would have to be introduced in order to result in a finding that a business name had been abandoned. Also, there must be a basis in the business name in order for the name's abandonment to give rise to a deduction.

[22]SEC. 165. LOSSES.

(b) AMOUNT OF DEDUCTION.—For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property.

[23]We note that the dollar value of the partnership's name or goodwill is not at issue herein.

[24]SEC. 732. BASIS OF DISTRIBUTED PROPERTY OTHER THAN MONEY.

(b) DISTRIBUTIONS IN LIQUIDATION.—The basis of property (other than money) distributed by a partnership to a partner in liquidation of the partner's interest shall be an amount equal to the adjusted basis of such partner's interest in the partnership reduced by any money distributed in the same transaction.

basis of this distributed property (other than the money) is an amount equal to the adjusted basis of petitioner's interest in the partnership,[25] reduced by the money distributed. The basis is allocated among the distributed properties pursuant to section 732(c).[26] Section 732(c)(1) requires that the basis be allocated first to any unrealized receivables and inventory items in an amount equal to the adjusted basis of each such property to the partnership. No unrealized receivables were distributed to petitioner; basis is to be allocated to the accounts receivable in an amount equal to the adjusted basis of the

---

[25]Sec. 705 provides for the determination of basis of a partner's interest in a partnership as follows:

SEC. 705. DETERMINATION OF BASIS OF PARTNER'S INTEREST.

(a) GENERAL RULE.—The adjusted basis of a partner's interest in a partnership shall, except as provided in subsection (b), be the basis of such interest determined under section 722 (relating to contributions to a partnership) or section 742 (relating to transfer of partnership interests)—

   (1) increased by the sum of his distributive share for the taxable year and prior taxable years of—

      (A) taxable income of the partnership as determined under section 703(a),

      (B) income of the partnership exempt from tax under this title, and

      (C) the excess of the deductions for depletion over the basis of the property subject to depletion; and

   (2) decreased (but not below zero) by distributions by the partnership as provided in section 733 and by the sum of his distributive share for the taxable year and prior taxable years of—

      (A) losses of the partnership, and

      (B) expenditures of the partnership not deductible in computing its taxable income and not properly chargeable to capital account.

(b) ALTERNATIVE RULE.—The Secretary or his delegate shall prescribe by regulations the circumstances under which the adjusted basis of a partner's interest in a partnership may be determined by reference to his proportionate share of the adjusted basis of partnership property upon a termination of the partnership.

The subsequent amendments of this provision by secs. 1906(b)(13) [sic](A) and 2115(c)(3) of the Tax Reform Act of 1976 (Pub. L. 94–455, 90 Stat. 1834, 1909) do not affect the year before us.

[26]SEC. 732. BASIS OF DISTRIBUTED PROPERTY OTHER THAN MONEY.

(c) ALLOCATION OF BASIS.—The basis of distributed properties to which subsection (a)(2) or subsection (b) is applicable shall be allocated—

   (1) first to any unrealized receivables (as defined in section 751(c)) and inventory items (as defined in section 751(d)(2)) in an amount equal to the adjusted basis of each such property to the partnership (or if the basis to be allocated is less than the sum of the adjusted bases of such properties to the partnership, in proportion to such bases), and

   (2) to the extent of any remaining basis, to any other distributed properties in proportion to their adjusted bases to the partnership.

accounts receivable to the partnership, since they represent inventory items.[27] Section 732(c)(2) provides that the remaining basis is to be allocated to any other distributed properties in proportion to their adjusted bases to the partnership. Therefore, petitioner's basis in his partnership interest, reduced by money distributed to him and amounts allocated to the accounts receivable, is to be allocated to the furniture and fixtures and the goodwill distributed to him in proportion to their adjusted bases to the partnership.

The parties agree that the partnership's adjusted basis in the goodwill was zero. The partnership did not make an election under section 754[28] which would have increased the partnership's basis in goodwill to reflect amounts paid by petitioner (and others) for goodwill. Therefore, at first glance, it appears that petitioner's remaining basis in his partnership interest would be allocated entirely to the furniture and fixtures. Since petitioner's basis in his partnership interest includes the premiums he paid for goodwill (see table 1 *supra*), the result of this allocation would be to allocate the amount he paid for goodwill to the furniture and fixtures, thereby assigning bases to the latter assets in excess of their fair market values.[29] Section 732(d)[30] prevents this odd result by

---

[27]The partnership used the accrual method of accounting, and so its accounts receivable were not unrealized receivables within the meaning of sec. 751(c), but instead were inventory items pursuant to sec. 751(d)(2)(B). Sec. 1.751–1(d)(2)(ii), Income Tax Regs.

[28]SEC. 754. MANNER OF ELECTING OPTIONAL ADJUSTMENT TO BASIS OF PARTNERSHIP PROPERTY.

If a partnership files an election, in accordance with regulations prescribed by the Secretary or his delegate, the basis of partnership property shall be adjusted, in the case of a distribution of property, in the manner provided in section 734 and, in the case of a transfer of a partnership interest, in the manner provided in section 743. Such an election shall apply with respect to all distributions of property by the partnership and to all transfers of interest in the partnership during the taxable year with respect to which such election was filed and all subsequent taxable years. Such election may be revoked by the partnership, subject to such limitations as may be provided by regulations prescribed by the Secretary or his delegate.

The subsequent amendment of this provision by sec. 1906(b)(13) [sic] (A) of the Tax Reform Act of 1976 (Pub. L. 94–455, 90 Stat. 1834) does not affect the year before us.

[29]The parties stipulated that the fair market values of the accounts receivable and the furniture and fixtures of the partnership did not exceed their bases to the partnership.

[30]SEC. 732. BASIS OF DISTRIBUTED PROPERTY OTHER THAN MONEY.

(d) SPECIAL PARTNERSHIP BASIS TO TRANSFEREE.—For purposes of subsections (a), (b), and (c), a partner who acquired all or part of his interest by a transfer with respect to which the election provided in section 754 is not in effect, and to whom a distribution of property (other than money) is made with respect to the transferred interest within 2 years after such

treating the partnership's adjusted basis in distributed property, to the extent possible, as though (1) a section 754 election had been in effect when the distributee partner acquired his partnership interest by transfer, and (2) a section 743(b) adjustment had been made.

As authorized by the last sentence of section 732(d), section 1.732–1(d)(4), Income Tax Regs.,[31] requires a partner, who acquired any part of his partnership interest in a transfer to which the election provided in section 754 was not in effect, to apply the special basis rule contained in section 732(d) to a distribution to him, whether or not made within 2 years after the transfer, if the three conditions of the regulation are met. At the time of each of petitioner's purchases of an interest in the partnership, the fair market value of all partnership property (other than money) exceeded 110 percent of its adjusted basis to the partnership. (See note 6 and accompanying text *supra*.) Thus, the first condition of the regulation is met.

The second condition of the regulation is also met. Petitioner purchased various interests in the partnership, as shown in table 1 *supra*. As to each purchase, he paid an amount in

---

transfer, may elect, under regulations prescribed by the Secretary or his delegate, to treat as the adjusted partnership basis of such property the adjusted basis such property would have if the adjustment provided in section 743(b) were in effect with respect to the partnership property. The Secretary or his delegate may by regulations require the application of this subsection in the case of a distribution to a transferee partner, whether or not made within 2 years after the transfer, if at the time of the transfer the fair market value of the partnership property (other than money) exceeded 110 percent of its adjusted basis to the partnership.

The subsequent amendment of this provision by sec. 1906(b)(13) [sic] (A) of the Tax Reform Act of 1976 (Pub. L. 94–455, 90 Stat. 1834) does not affect the year before us.

[31]Sec. 1.732–1. Basis of distributed property other than money.

(d) *Special partnership basis to transferee under section 732(d).* * * *

    *        *        *        *        *        *        *

(4) A partner who acquired any part of his partnership interest in a transfer to which the election provided in section 754 was not in effect, is required to apply the special basis rule contained in section 732(d) to a distribution to him, whether or not made within 2 years after the transfer, if at the time of his acquisition of the transferred interest—

(i) The fair market value of all partnership property (other than money) exceeded 110 percent of its adjusted basis to the partnership,

(ii) An allocation of basis under section 732(c) upon a liquidation of his interest immediately after the transfer of the interest would have resulted in a shift of basis from property not subject to an allowance for depreciation, depletion, or amortization, to property subject to such an allowance, and

(iii) A special basis adjustment under section 743(b) would change the basis to the transferee partner of the property actually distributed.

excess of the respective interest's proportionate share of the partnership's adjusted basis in its property. It is agreed that the excess was paid for goodwill. If there had been a liquidation of the partnership immediately after each of petitioner's purchases, petitioner's basis in his partnership interest (reduced by money distributable to him and amounts allocable to accounts receivable under section 732(c)(1)) would have been allocated entirely to furniture and fixtures under section 732(c)(2) because the partnership had no basis in its goodwill. Thus, an allocation of basis under section 732(c) would have resulted in a shift of basis from property not subject to an allowance for depreciation, depletion, or amortization (goodwill (e.g., *Misegades v. Commissioner*, 53 T.C. 477 (1969))) to property subject to such an allowance (furniture and fixtures).

The final condition of the regulation is that a special basis adjustment under section 743(b) would change the basis of the transferee partner in the property actually distributed. Under section 743(b),[32] a partnership's adjusted basis in its property is increased by the excess of the transferee partner's basis in his partnership interest over his proportionate share of the adjusted basis of all the partnership property. This excess is then allocated among partnership properties in accordance with section 755. Sec. 743(c). The regulations under section 755 provide that, if there is an increase in basis to be allocated to

---

[32]SEC. 743. OPTIONAL ADJUSTMENT TO BASIS OF PARTNERSHIP PROPERTY.

(b) ADJUSTMENT TO BASIS OF PARTNERSHIP PROPERTY.—In the case of a transfer of an interest in a partnership by sale or exchange or upon the death of a partner, a partnership with respect to which the election provided in section 754 is in effect shall—

(1) increase the adjusted basis of the partnership property by the excess of the basis to the transferee partner of his interest in the partnership over his proportionate share of the adjusted basis of the partnership property, or

(2) decrease the adjusted basis of the partnership property by the excess of the transferee partner's proportionate share of the adjusted basis of the partnership property over the basis of his interest in the partnership.

Under regulations prescribed by the Secretary or his delegate, such increase or decrease shall constitute an adjustment to the basis of partnership property with respect to the transferee partner only. A partner's proportionate share of the adjusted basis of partnership property shall be determined in accordance with his interest in partnership capital and, in the case of an agreement described in section 704(c)(2) (relating to effect of partnership agreement on contributed property), such share shall be determined by taking such agreement into account. In the case of an adjustment under this subsection to the basis of partnership property subject to depletion, any depletion allowable shall be determined separately for the transferee partner with respect to his interest in such property.

The subsequent amendment of this provision by sec. 1906(b)(13) [sic] (A) of the Tax Reform Act of 1976 (Pub. L. 94–455, 90 Stat. 1834) does not affect the year before us.

partnership assets, then the increase must be allocated only to assets whose values exceed their bases. Sec. 1.755–1(a)(1)(ii), Income Tax Regs. Further, a portion of the adjustment must be allocated to partnership goodwill to the extent that goodwill exists and is reflected in the price at which the partnership interest is sold. Sec. 1.755–1(a)(1)(iv), Income Tax Regs. Since the parties agree that goodwill was the only asset of the partnership whose fair market value exceeded its basis to the partnership when petitioner purchased each of his interests, a special basis adjustment under section 743(b) would increase the partnership's adjusted basis in goodwill with respect to each premium paid by petitioner. This, in turn, would result in the allocation of a portion of petitioner's basis in his partnership interest (reduced by money distributed to him and amounts allocated to accounts receivable under section 732(c)(1)) to goodwill under section 732(c)(2). Thus, a special basis adjustment under section 743(b) would change petitioner's basis in property actually distributed (furniture and fixtures and goodwill), the third condition of the regulation.

We conclude that petitioner's basis in goodwill must be computed using the special basis rule provided in section 732(d). Sec. 1.732–1(d)(4), Income Tax Regs. Consequently, for purposes of allocating petitioner's basis under section 732(c), the partnership's adjusted basis in goodwill is treated as though the above-described section 743(b) adjustments with respect to petitioner's purchases of partnership interests had been made.[33] Therefore, a portion of petitioner's basis in his partnership interest is allocable to goodwill on its distribution by the partnership.

Petitioner calculates the amount of his basis allocable to goodwill to be $32,733. However, this amount appears to be the partnership's adjusted basis (determined under sec. 732(d)) in petitioner's proportionate share of goodwill. See table 1 *supra*. From the information in the record, we are unable to determine the precise computation of petitioner's basis in goodwill and so we leave this determination to the computa-

---

[33]The adjustments to basis under sec. 743(b) affect the partnership's basis with respect to the transferee partner only. Sec. 1.743–1(b)(1), Income Tax Regs. Accordingly, it is not necessary to take into account the amounts paid for goodwill by other partners (see note 12 *supra* ).

tion under Rule 155, Tax Court Rules of Practice and Procedure.[34] Petitioner is entitled to a loss deduction equal to 20 percent of his adjusted basis in goodwill.

As a final matter, respondent contends that any loss recognizable by petitioner is a capital loss. In support thereof, respondent relies on section 731(a) and derivatively on section 741. We have already concluded that petitioner's loss is not governed by section 731(a). For the same reason, we also reject this argument. Notwithstanding the fact that goodwill is a capital asset, petitioner's loss is an ordinary loss since an abandonment involves no sale or exchange. *Parmelee Transportation Co. v. United States*, 173 Ct.Cl. 139, 145, 351 F.2d 619, 623 (1965). See sec. 165(f).

To reflect the conclusions reached herein,

*Decision will be entered under Rule 155.*

---

[34]The starting point for computing petitioner's basis in goodwill distributed by the partnership is his adjusted basis in his parternship interest, as determined under sec. 705. The parties stipulated to petitioner's cost basis without taking into account the adjustments provided in sec. 705. See note 11 *supra*. Thus, we are unable to determine petitioner's basis under sec. 705. In addition, we are unable to determine the amounts of money and accounts receivable distributed to petitioner so as to make the allocations of basis provided in sec. 732(c).